| | |
|---|---|
| **JOHN SMITH and SOYNIA SMITH**, as survivors and next of kin of **ADDISON SMITH**, deceased,<br><br>Plaintiffs,<br><br>vs.<br><br>**CORECIVIC, INC., DAMON T. HININGER, GRADY PERRY, EDDIE JOHNSON, JASON WHITEHEAD, ASHLEY ACKERMAN, CHRISTOPHE WILLIAMS, LOGAN KING, JOSHUA RAY, JENNY RATLIFF, LEDIA ALVA, WILLIAM LYONS, J. SCOTT LONG, MARK SIGLER, ELAINE BLOODGOOD, ANDREA STEADMAN, KEVIN TURNER, and MARCAYUS ROSE.**<br><br>Defendants | **Case No. 3:20-cv-00563**<br><br>**JURY DEMAND** |

## FIRST AMENDED COMPLAINT

NOW COME John Smith and Soynia Smith, the Plaintiffs herein, stating and alleging as follows:

### Introduction

1. The Plaintiffs' 27-year-old son, Addison Smith, committed suicide on August 23, 2020, four days after he was raped by another inmate in the South Central Correctional Center ("SCCC"), a private prison in Clifton, Tennessee operated by Defendant CoreCivic, Inc. Addison had a history of mental health problems dating back to childhood, and he had threatened

- 1 -

suicide multiple times prior to his death. The rapist, Marcayus Rose, was sent to segregation ironically because other inmates in general population reported that Inmate Rose was harassing them for sex. Inmate Rose is a high-ranking member of the Gangster Disciples and, for reasons yet unexplained, he was assigned to the same cell as Addison despite Addison's obvious vulnerabilities.

2. After filing their Original Complaint, the Plaintiffs served a subpoena duces tecum on the Tennessee Department of Corrections ("TDOC"). On August 12, 2020 and August 18, 2020, TDOC produced records revealing the rape described above, as well as equally troubling information concerning Addison's death. The Plaintiffs incorporate by reference the investigative report of TDOC Special Agent Nicky Jordan (attached as Exhibit 1) and the internal report of CoreCivic Investigator Jessica Frakes (attached as Exhibit 2). As shown by both TDOC records and CoreCivic's own records, CoreCivic personnel repeatedly ignored Addison's stated intent to kill himself, failed to provide him with mental health care, and even failed to provide him with food. Shortly after Addison's death, at least one CoreCivic employee tampered with records in order to hide his criminal negligence. Less than three weeks after Addison's death, CoreCivic supervisors up to and including the warden signed off on a report that whitewashed many of the failures that resulted in the rape (and ultimately the suicide) of Addison.

**Jurisdiction and Venue**

3. This Court has jurisdiction under 28 U.S.C. § 1331 because the Plaintiff asserts federal claims under 42 U.S.C. § 1983.

4. Venue is proper in this Court because some of the Defendants reside or are located in the Middle District of Tennessee, and the acts giving rise to this lawsuit occurred in the Middle

District of Tennessee.

## Parties

5.  Plaintiff John Smith is the father of Addison Smith, an inmate who committed suicide at the South Central Correctional Center ("SCCC"), a private prison in Clifton, Tennessee. He asserts claims as his survivor and his next of kin.

6.  Plaintiff Soynia Smith is the mother of Addison Smith. She asserts claims as his survivor and his next of kin.

7.  Defendant CoreCivic, Inc. is a private prison company headquartered in Nashville, Tennessee.

8.  Defendant Damon Hininger is the chief executive officer of CoreCivic, Inc.

9.  Defendant Grady Perry is the warden of SCCC.

10.  Defendant Eddie Johnson is an assistant warden of SCCC.

11.  Defendant Jason Whitehead was a correctional officer at SCCC at all times relevant. He was the captain on duty when Addison died.

12.  Defendant Ashley Ackerman was a correctional officer at SCCC at all times relevant. She was the sergeant overseeing Addison's unit when Addison died.

13. Defendant Christopher Williams was a senior correctional officer at SCCC at all times relevant.  He was working in Addison's unit when Addison died.

14. Defendant Logan King was a correctional officer at SCCC at all times relevant. He was working in Addison's unit when Addison died.

15. Defendant Joshua Ray was a correctional officer at SCCC at all times relevant. He was working in Addison's unit when Addison died.

16. Defendant Jenny Ratliff was a correctional officer at SCCC at all times relevant. He

- 3 -

was working in Addison's unit when Addison died.

17. Defendant Ledia Alva was a correctional officer assigned to SCCC at all times relevant. She was working in Addison's unit when Addison died.

18. Defendant William Lyons was a mental health counselor at SCCC at all times relevant. He was assigned to care for Addison.

19. Defendant J. Scott Long was a mental health counselor at SCCC at all times relevant, and he also provided mental health services to Addison.

20. Defendant Mark Sigler, Ph.D., is a clinical psychologist at SCCC who was assigned to care for Addison.

21. Defendant Elaine Bloodgood, Ph.D., is a clinical psychologist who oversees mental healthcare at SCCC.

22. Defendant Andrea Steadman is a psychiatric nurse practitioner who was assigned to care for Addison.

23. Defendant Kevin Turner, M.D., is a psychiatrist who was responsible for supervising Defendant Steadman at all times relevant.

24. Defendant Marcayus Rose is an inmate currently incarcerated at Troutsdale Turner Correctional Facility who was Addison's cell mate at SCCC and who raped Addison four days prior to Addison's suicide.

**Facts**

25. In July of 2019, Addison was transferred from Trousdale Turner Correctional Center ("TTCC") to SCCC. Both facilities are owned and operated by CoreCivic. In the months before his transfer, Addison had a documented history of suicide attempts and hallucinations, the former dating back to childhood. On July 23, 2019, Addison was seen by an SCCC mental health

- 4 -

counselor, and Addison reported that he had been off his psychiatric medications for two weeks. The counselor made a referral on the date to the facility's psychiatric nurse practitioner, Defendant Steadman. Two days later, a nurse separately referred Addison to the nurse practitioner. Defendant Steadman did not meet with Addison until August 19, 2019, *i.e.*, nearly a month after he was reported to be off his medications. This caused Addison additional, needless suffering, and it likely contributed to his suicide. Defendant Turner was supposed to be supervising Defendant Steadman, but he failed to prevent her malpractice and gross negligence.

26. In mid-August of 2019, Defendant Rose was transferred to the segregation unit at SCCC because he had been harassing other inmates for sex. On August 19, 2019, Defendant Rose coerced Addison into unwanted sex acts by making threats and by telling Addison that he was a ranking member of the Gangster Disciples. Later that day, Addison reported the sexual assault to a guard, and he was transported to a local hospital for an evaluation.

27. On August 22, 2019, the day before Addison's death, he was evaluated by Defendant Sigler, a clinical psychologist and a mental health supervisor at SCCC. On the report form, Defendant Sigler did not answer questions about whether Addison had a history of suicidal behavior, whether Addison was taking psychiatric medications, whether Addison had a history of drug abuse, and whether Addison had a history of psychiatric treatment. Instead, Defendant Sigler put a question mark in between the "yes" and "no" boxes. The evaluation form was not signed until August 26, 2019, *i.e.*, four days after the evaluation and three days after Addison's death. In the notes section, Defendant Sigler claimed that he had not been able to access Addison's medical records. On August 12, 2019, however, Defendant Sigler and Defendant Long signed off on an identical form stating that the answer was "no" to the same questions. Three of the four answers in the August 12, 2019 form were wrong, because Defendant did have

- 5 -

a history of suicidal behavior, he <u>did</u> have a history of psychiatric treatment, and he <u>did</u> have a history of drug abuse. On July 23, 2019, the same form had yet another set of answers to the same question, but that time the answers were correct. The form was signed by Defendant Sigler and Defendant Long. The Plaintiffs allege that Defendants Sigler and Long were not even looking at Addison's mental health history and they did not familiarize themselves with his case, ergo his case was not being treated with the urgency that it required.

28. Defendant Bloodgood is responsible for overseeing mental healthcare at SCCC, and she failed to supervise Defendants Sigler and Long. A quick review of their records would have shown that they were not providing adequate care for Addison. As a result of her failure to supervise, Addison's mental healthcare was haphazard and grossly inadequate. CoreCivic's own records show that Addison was repeatedly put into disciplinary segregation rather than being treated for his severe and ongoing mental health problems.

29. Defendant Rose raped Addison on August 19, 2019, Defendant Lyons was supposed to provide mental health services related to the rape. He did not. After Addison died, Defendant Long caught Defendant Lyons fabricating records to make it appear that he met with Addison after the rape. Defendant Long was confronted by CoreCivic's internal investigators, and he was allowed to resign.

30. As set forth in Agent Jordan's report and Investigator Frakes's report, Defendants Whitehead, Ackerman, Williams, King, Ray, Ratliff, and Alva were correctional officers on duty the day that Addison died. Despite Addison's repeated statements throughout the afternoon and evening of August 23, 2020 that he was thinking about killing himself or intended to kill himself, they did not intervene. Video from the prison shows that Addison hung a towel over the window to his cell at 7:17 p.m. As a result, the Defendant guards and supervisors were unable to perform

safety checks on Addison, who had already been threatening suicide for hours. The Defendant guards did not even discover the towel until 7:52 p.m., and Addison did not respond to their verbal inquiries. Despite the clear and imminent danger, the Defendant guards and supervisors did not make entry to Addison's cell until 8:23 p.m., when he was found hanging. By then, Addison could not be revived.

31. In the reports of Agent Jordan and Investigator Frakes, Defendants Whitehead, Ackerman, Williams, King, Ray, Ratliff, and Alva give conflicting answers about what happened on the date of Addison's death. According to prison logs, Addison had not been provided any food the entire day. Agent Jordan noted that the Defendants gave conflicting accounts about whether Addison had been provided food, but the Defendants acknowledged that Addison had been threatening to kill himself if he was not provided a meal tray. According to the autopsy report, no food was found in Addison's stomach. Defendant Ackerman, a supervisor, admitted that she thought Addison was bluffing when he threatened to kill himself, and therefore she did not take his threats seriously. She was terminated by CoreCivic, but none of the other guards or supervisors were terminated.

32. Investigator Frakes's investigative report on the rape is a clear example of the culture of deliberate indifference (and cover-up) fostered by Warden Perry at SCCC and by CoreCivic generally. The standard form completed by Ms. Frakes included a list of questions. Question 1 asked whether the rape was motivated by things such as race, ethnicity, gang affiliation, etc., and if the answer was "yes," what could be done to prevent the problem from reoccurring. Ms. Frakes simply answered "No." In reality, her own records showed that Addison, a white male, reported that he was raped by a senior leader of an African-American criminal gang. Question 2 asked, "Was any information available that should or could have alerted staff that the incident

- 7 -

may occur?" She answered "No" despite the fact that Defendant Rose had been put into segregation *precisely because* he was pressuring other inmates for sex. Most of her remaining answers are comparably absurd, yet the whitewash / report was approved by Defendant Johnson and Defendant Perry on September 11, 2019.  Such reports are mandated by the federal Prison Rape Elimination Act, and they are designed to reduce the number of future sexual assaults, yet Ms. Frakes, Defendant Johnson and Defendant Perry treated the whole thing like a joke. In other words, Defendants Johnson and Perry are deliberately indifferent to prison rape at SCCC.

33.  Agent Jordan was so appalled by what he discovered that he referred Defendants Ackerman and Lyons to Brent A. Cooper, the district attorney for Wayne County, for criminal prosecution. Unfortunately, Mr. Cooper has shown no interest in the case. CoreCivic's prisons are primarily located in rural counties, and they are often one of the largest local employers, which may explain why Mr. Cooper is not interested.  Furthermore, Tennessee's small-town prosecutors generally do not care whether an inmate's death was the result of a crime.

34.  Mr. Smith's death was part of a pattern. Prior to his death, CoreCivic paid millions in settlements around the United States because (1) it routinely understaffed its correctional facilities, inevitably resulting in anarchy, assault, murder, and suicide; and (2) it routinely failed to provide adequate medical and mental health care to inmates. The understaffing is particularly problematic because criminal gangs are practically running many of CoreCivic's facilities, including SCCC. Dangerous gang members like Defendant Rose are not properly segregated from other inmates, resulting in more assaults and sexual assaults. Inmates have further alleged that some of CoreCivics guards belong to the same criminal street gangs as some of the inmates.

35.  In 2016, CoreCivic and its directors were sued by company shareholders because, among other things, the company misrepresented its pattern of understaffing and poor medical

care, which ultimately led the Federal Bureau of Prisons to cancel its business relationship with Core Civic. Notwithstanding these and numerous other warnings, CoreCivic continued to provide inadequate staffing, supervision and medical care at its facilities, including SCCF.

36. Under the leadership of Defendant Heninger, CoreCivic has an established history of putting profits ahead of the health and safety of inmates. According to a 2011 lawsuit filed by the American Civil Liberties Union, for example, inmates referred to CoreCivic's Idaho Correctional Center as "Gladiator School" because the understaffing led to such a violent atmosphere at the prison. CoreCivic settled the lawsuit with the ACLU, agreeing to provide minimum staff levels, but the company was held in contempt of court in 2013 because it violated the agreement and falsified records to misrepresent the number of guards on duty. In 2014, the FBI opened an investigation of the company based on its billing for "ghost employees," Idaho Governor Butch Otter ordered state officials to take control of the prison, and the company paid the state $1 million for understaffing the prison.

37. On or about February 23, 2017, a federal jury found that CoreCivic had violated inmates' Eighth Amendments rights to be free from cruel and unusual punishment by being deliberately indifferent to the serious risk posed by the company's long-standing practice of understaffing the Idaho Correctional Center. The jury did not award damages, however, because it found that the inmates' particular injuries were caused by other factors.

38. At an Oklahoma prison operated by CoreCivic, ten prisoners were involved in a fight on February 25, 2015 that left five with stab wounds. The following month, eight more were involved in another stabbing incident. In June of that year, thirty-three gang members fought with weapons and eleven prisoners were sent to a hospital. On September 12, 2015, four inmates were killed during a riot at the same facility. Inmates alleged that gangs were effectively

allowed to run the prison. According to an investigation by the Oklahoma Department of Corrections, video evidence of the September 12, 2015 incident from three cameras at the facility was recorded over or deleted by CoreCivic employees. Two guards were later indicted for bringing drugs and other contraband into the prison, including one of the guards accused of failing to act during the riot. Between 2012 and 2016, one-third of all homicides in Oklahoma prisons occurred at two CoreCivic facilities, though they held just over 10 percent of the state's prison population.

39. In August of 2016, the Office of the Inspector General ("OIG") of the U.S. Department of Justice found widespread deficiencies in staffing and medical care at facilities operated for the federal Bureau of Prisons by private contractors, including those operated by CoreCivic. As a result, the Department of Justice indicated that it would phase out its relationships with private prisons. That, in turn, led to the shareholder lawsuit described above. In a separate report released on April 25, 2017, OIG found widespread understaffing at a detention facility in Leavenworth, Kansas operated by CoreCivic for the U.S. Marshals Service, with vacancy levels reaching as high as 23 percent between 2014 and 2015. Earlier, the company tried to hide the fact that it was packing three inmates into two-inmate cells at Leavenworth, contrary to prison regulations. The following excerpt appears in the April 25, 2017 OIG report:

> In 2011, without the knowledge of the [U.S. Marshals Service], the [Leavenworth Detention Center or "LDC"] took steps to conceal its practice of triple bunking detainees. LDC staff uninstalled the third beds bolted to the floor of several cells designed for two detainees and removed the beds from the facility in advance of a 2011 American Correctional Association (ACA) accreditation audit. A subsequent CoreCivic internal investigation revealed that this may have also occurred during other ACA audits of the LDC.

The Plaintiffs restate the foregoing allegations as their own.

- 10 -

40. In May of 2012, a riot at a federal prison operated by CoreCivic in Natchez, Mississippi resulted in the death of a guard and injuries to approximately 20 inmates and prison staff. OIG investigated and alleged the following in a report released in December of 2016:

> The riot, according to a Federal Bureau of Investigation (FBI) affidavit, was a consequence of what inmates perceived to be inadequate medical care, substandard food, and disrespectful staff members. A BOP after-action report found deficiencies in staffing levels, staff experience, communication between staff and inmates, and CoreCivic's intelligence systems. The report specifically cited the lack of Spanish-speaking staff and staff inexperience.
>
> Four years after the riot, we were deeply concerned to find that the facility was plagued by the same significant deficiencies in correctional and health services and Spanish-speaking staffing. In 19 of the 38 months following the riot, we found CoreCivic staffed correctional services at an even lower level than at the time of the riot in terms of actual post coverage. Yet CoreCivic's monthly reports to the BOP, which were based on simple headcounts, showed that correctional staffing levels had improved in 36 of those 38 months.

The Plaintiffs adopt the foregoing allegations as their own.

41. A state audit released in 2017 found that Whiteville Correctional Facility (operated by CoreCivic) needed 79 officers to cover 17 positions during a shift, but on average the facility provided only 57 officers per shift. The same audit found systemic problems at Hardeman County Correctional Center ("HCCC") and TTCC, including understaffing and gang violence. The audit further noted that information provided by CoreCivic concerning TTCC and HCCC was so incomplete that it was not possible to determine the accuracy of staffing levels. The Plaintiff alleges that CoreCivic deliberately provided incomplete information in order to disguise the fact that it was understaffing both facilities.

42. On December 12, 2017, a former guard at TTCC testified before a legislative committee that she resigned from the company in September after witnessing two inmates die from medical neglect during the seven months that she worked for the company. Ashley Dixon told lawmakers that in one instance she pleaded with her superiors for three days to help a dying

- 11 -

inmate, but to no avail, and her subsequent complaints were ignored by company officials.

43. The Plaintiffs allege that suicides in CoreCivic facilities are the result of deliberate indifference, particularly because of its policies of (1) inadequate inmate supervision and (2) providing inadequate mental health care. On August 30, 2016, for example, inmate Thomas Shane Miles was allowed to hang himself in an Indiana jail operated by CoreCivic despite two suicide attempts in the previous four days. On May 3, 2017, immigration detainee Jean Jimenez-Joseph was able to hang himself at a Georgia facility operated by CoreCivic, despite the fact that he was supposed to be on suicide watch. At the same facility less than two years later, another immigrant on suicide watch, Efrain De La Rosa, was nonetheless able to hang himself. In 2018, the family of Jose de Jesus Deniz-Sahagun filed suit against CoreCivic because he was allowed to kill himself at Eloy Detention Center, an immigrant detention facility operated by CoreCivic. According to a February 24, 2018 story in the *Pinal Central* newspaper,

> His was the fifth suicide reported at the Eloy facility since the mid-2000s, a high number compared to other detention centers across the country.
>
> The detainees who preceded Deniz-Sahagun hanged themselves with bed sheets or shoelaces.
>
> An analysis by National Public Radio in 2016 determined that the prison had the highest number of deaths in the country. The *Arizona Republic* made the same determination in 2015.

On December 6, 2018, Ross Hamilton Anderson was found hanging in his cell at Trousdale-Turner.

44. The Plaintiffs allege that the foregoing incidents actually understate the problem. A scathing audit released by the Tennessee Comptroller on January 10, 2020 found that CoreCivic had not properly recorded information about accidents, illnesses, and traumatic injuries at two of its facilities in Tennessee. Likewise, nurses at two CoreCivic facilities failed to monitor inmates

- 12 -

to insure they were taking their medications, increasing the likelihood that mentally-ill and suicidal inmates would skip their medications. The same audit found that Whiteville Correctional Facility, which is operated by CoreCivic, was missing nearly one-third of its medical and mental health personnel during two different audit periods, and that homicides were two times more likely in CoreCivic facilities than in state-operated facilities.

45. The foregoing incidents – and others like them – demonstrate that CoreCivic, its wardens, its senior officers, and its directors adopted and enforced a corporate policy of deliberate indifference to inmate health and safety, specifically illustrated by inadequate inmate supervision and inadequate medical and mental health care for inmates, all for the purpose of increasing the company's profits, and notwithstanding the fact that such practices consistently led to riots, rapes, assaults, suicides, murder, and mayhem. The rape and suicide of Addison Smith were predictable consequences of this corporate policy.

46. The directors and senior officers of CoreCivic knew that inadequate supervision, inadequate mental health and medical care, inadequate training, and improper inmate segregation practices were rampant at the company's facilities, and they did not make reasonable efforts to change corporate policies, supervise offending employees, or counteract the threats to inmate safety. This is evidenced by the fact that most of the employees who played a role in Addison's death were not terminated.

**Claims**

**Count 1: Civil Rights Violations**

47. All prior paragraphs are incorporated herein by reference.

48. The Plaintiffs bring claims against all Defendants except Defendant Marcayus Rose under 42 U.S.C. §1983 because they violated Addison Smith's Eighth Amendment right to be

- 13 -

free from cruel and unusual punishment. Specifically, they failed to protect him from rape and self-harm, and they failed to provide adequate treatment for his mental illness.

**Count 2: Wrongful death**

49.  All prior paragraphs are incorporated herein by reference.

50.  The Plaintiffs bring claims of wrongful death against all of the Defendants.

**Count 3: Medical malpractice**

51.  All prior paragraphs are incorporated herein by reference.

52.  The Plaintiffs bring claims of medical malpractice against all of the Defendants except Defendant Marcayus Rose.

**Count 4: Gross Negligence**

53.  All prior paragraphs are incorporated herein by reference.

54.  The Plaintiffs bring claims against all of the Defendants except Defendant Marcayus Rose for gross negligence leading to the death of Addison Smith.

55.  The Plaintiffs bring claims against Defendant CoreCivic for gross negligence leading to the rape of Addison Smith.

**Count 5: Negligence**

56.  All prior paragraphs are incorporated herein by reference.

57.  The Plaintiffs bring claims against all of the Defendants except Defendant Marcayus Rose for negligence leading to the death of Addison Smith.

58. The Plaintiffs bring claims against Defendant CoreCivic for negligence leading to the rape of Addison Smith.

**Count 6: Assault**

59. All prior paragraphs are incorporated herein by reference.

60. The Plaintiffs bring claims against Defendant Rose for sexually assaulting Addison. Defendant CoreCivic is also liable for the sexual assault insofar as placed Defendant Rose in the same call as Addison despite the known danger.

### Request for Relief

61. The Plaintiffs respectfully pray that upon a final hearing of this case, judgment be entered for them against the Defendants, for actual and punitive damages together with pre-judgment interest at the maximum rate allowed by law; post-judgment interest at the legal rate; costs of court; attorney fees; and such other and further relief to which the Plaintiffs may be entitled at law or in equity.

**THE PLAINTIFFS DEMAND A JURY TRIAL.**

Respectfully submitted,

**/s/ Janet H. Goode**
Janet H. Goode
Tennessee BPR No. 035872
917 S. Cooper Street
Memphis, Tennessee 38104
(901) 308-7511
(901) 641-3972 (fax)
*janet@janetgoodelaw.com*

**/s/ Ty Clevenger**
Ty Clevenger (admitted *pro hac vice*)
Texas Bar No. 24034380
P.O. Box 20753
Brooklyn, New York 11202-0753
(979) 985-5289
(979) 530-9523 (fax)
*tyclevenger@yahoo.com*

**Attorneys for Plaintiffs**

- 15 -

## CERTIFICATE OF SERVICE

I certify that I filed a copy of the Plaintiffs' First Amended Complaint with the Court's ECF system on August 19, 2020, resulting in automatic notification to Nathan Tilly (ntilly@pgmfirm.com) and James Pentecost (jpentecost@pgandr.com), counsel for the Defendants.

**/s/ Janet H. Goode**
Janet H. Goode