# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **JOHN SMITH and SOYNIA SMITH,** | ) | |
| **as survivors and next of kin of** | ) | |
| **ADDISON SMITH, deceased,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:20-cv-00563** |
| | ) | **Judge Aleta A. Trauger** |
| **CORECIVIC, INC. et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Before the court are (1) the plaintiffs' Revised Motion to Amend Scheduling Order and Revised Motion to Amend Complaint ("Motion to Amend"), filed with a proposed Second Amended Complaint ("second SAC") (Doc. Nos. 102, 102-1), which superseded their original Motion of the same title and the first version of the proposed Second Amended Complaint (Doc. Nos. 101, 101-1); and (2) the plaintiffs' Motion Regarding Second Amended Complaint ("Supplemental Motion"), filed with the third version of the proposed Second Amended Complaint ("third SAC" or, collectively with the second SAC where it is unnecessary to distinguish between them, "SAC" or "proposed SAC") (Doc. Nos. 125, 125-1).

For the reasons set forth herein, the plaintiffs' Motion to Amend and Supplemental Motion will be granted in part and denied in part.

## I. FACTUAL AND PROCEDURAL HISTORY

The plaintiffs, John Smith and Soynia Smith, are the parents of Addison Smith, who committed suicide on August 23, 2019 while incarcerated at South Central Correctional Facility ("SCCF" or "SCCC"), a facility operated by defendant CoreCivic, Inc. ("CoreCivic"), under a

contract with the Tennessee Department of Correction ("TDOC"). The suicide occurred four days after Addison was allegedly raped by Marcayus Rose, another inmate at SCCF. The Smiths filed this lawsuit in June 2020 following the death of their son, essentially seeking to hold the defendants liable for both the sexual assault and the suicide, as well as for failing, more generally, to provide necessary mental health care to Addison.

The named defendants in the First Amended Complaint ("FAC") were CoreCivic; Damon T. Hininger, CoreCivic's Chief Executive Officer; Grady Perry and Eddie Johnson, SCCF Warden and Assistant Warden, respectively; SCCF Correctional Officers Jason Whitehead, Ashley Ackerman, Christopher Williams, Logan King, Joshua Ray, Jenny Ratliff,[1] and Ledia Avila (incorrectly named in the plaintiffs' pleadings as Ledia Alva); mental health counselors William Lyons and J. Scott Long, assigned to provide mental health services to Addison while he was at SCCF; Mark Sigler, Ph.D., a clinical psychologist at SCCF assigned to provide care for Addison; Elena Bloodgood-Grandy, Ph.D. (incorrectly named in the plaintiffs' pleadings as Elaine Bloodgood),[2] a clinical psychologist charged with "oversee[ing] mental healthcare" at SCCF; Andrea Steadman, a psychiatric nurse practitioner assigned to care for Addison at SCCF; Kevin Turner, M.D., a psychiatrist charged with supervising defendant Steadman; and Marcayus Rose, an inmate formerly incarcerated at SCCF who raped Addison while assigned as his cell mate. (Doc. No. 16 ¶¶ 5–24.)

---

[1] The plaintiffs spell this plaintiff's last name "Ratliff." The defendants sometimes spell it that way and sometimes as "Ratcliff." It is unclear which version is correct. The court will continue to spell it "Ratliff."

[2] It is unclear why the plaintiffs, in even the fifth version of their pleading (*i.e.*, the third version of the proposed Second Amended Complaint), have made no effort to correct the spelling of the names of defendants Avila and Bloodgood-Grandy.

In the FAC, the plaintiffs asserted claims against "all of the Defendants except Defendant Marcayus Rose" (1) under 42 U.S.C. § 1983, for violating Addison's Eighth Amendment right to be free from cruel and unusual punishment by "fail[ing] to protect him from rape and self-harm" and "fail[ing] to provide adequate treatment for his mental illness" (Doc. No. 16 ¶ 48); and (2) under state law, for medical malpractice, negligence, and gross negligence. They also asserted a claim against Rose and CoreCivic for common law assault and a claim against all defendants for "wrongful death." (Doc. No. 16 Counts 2 through 6.)

As summarized in the court Memorandum ruling on the defendants' motions for partial dismissal, filed on June 25, 2021, the background facts alleged in support of the plaintiffs' claims are as follows:

> In July 2019, Addison was transferred from [Trousdale Turner Correctional Center] to SCCC. He had a "documented history" of hallucinations as well as suicide attempts dating back to childhood. He saw an unidentified mental health counselor at SCCC on July 23, 2019, at which time he reported that he had been off his psychiatric medications for two weeks. The counselor referred him to Steadman; two days later, an unidentified nurse separately referred Addison to Steadman. However, Steadman did not meet with Addison until August 19, 2019, nearly a month after he reported being off his medications for two weeks. The plaintiffs allege that the significant delay in getting his medications refilled caused Addison "additional, needless suffering, and it likely contributed to his suicide." ([Doc. No. 16] ¶ 25.) Defendant Turner was "supposed to be overseeing" Steadman, but he allegedly "failed to prevent her malpractice and gross negligence." (*Id.*)
>
> Defendant Rose was transferred to the segregation unit at SCCC in mid-August 2019 because he had reportedly been "harassing" other inmates for sex. (*Id.* ¶¶ 1, 26.) In the segregation unit, he was assigned to the same cell as Addison. (*Id.* ¶ 1.) On or around August 19, 2019, Rose coerced Addison into performing "unwanted sex acts" by threatening Addison and telling him that he was a high-ranking member of the Gangster Disciples. Addison reported the sexual assault to a guard on August 21, 2019, as a result of which he was transported to a local hospital for evaluation. (*Id.* ¶ 26; Doc. No. 16-2, at 5.) He returned to the prison on August 22 and was moved to a single-person cell while his claim was being investigated. (Doc. No. 16-2, at 5; Doc. No. 16-1, at 9.)
>
> Defendant Lyons was supposed to provide mental health services to Addison related to the alleged rape on August 22, 2019, but he failed to do so. After Addison died, Lyons fabricated a record to make it appear that he had met with Addison on

August 22, 2019, immediately after Addison returned to the prison following his evaluation at the hospital. (Doc. No. 16 ¶ 29; *see also* Doc. No. 16-2, at 12.) After CoreCivic discovered this falsification, Lyons was permitted to resign from his employment. (Doc. No. 16 ¶ 29.)

Addison was evaluated by Sigler, a clinical psychologist and mental health supervisor at SCCC, on August 22, 2019, the same day he should have seen Lyons. The FAC implies, but does not affirmatively allege, that Sigler should have had access to the plaintiff's mental health records, which would have alerted him to Addison's documented history of suicidal behavior. (*See* Doc. No. 16 ¶ 27 ("On the report form, Defendant Sigler did not answer questions about whether Addison had a history of suicidal behavior, whether Addison was taking psychiatric medications, whether Addison had a history of drug abuse, and whether Addison had a history of psychiatric treatment. Instead, Defendant Sigler put a question mark in between the 'yes' and 'no' boxes [on the form].").) This implication is supported by the exhibits attached to the pleading. (*See* Doc. No. 16-1, at 4 ("[TDOC Special Agent Nicky] Jordan secured a copy of the medical and mental health records of SMITH. It was noted there were self-reported multiple suicide attempts since age 10. It was reported in 2018, SMITH was found hanging and cut himself . . . . Multiple suicidal intentions beginning in 2019. . . .").) In addition, although Sigler wrote in the notes section of the form he completed that he had not been able to access Addison's medical records, Addison, upon his arrival at SCCC, was evaluated by a different counselor who, using the same form, correctly answered "yes" to the questions of whether Addison had a history of suicidal behavior and psychiatric treatment, and defendants Sigler and Long had both signed that form. The plaintiffs allege that Sigler and Long did not make an effort to familiarize themselves with Addison's mental health history and, therefore, failed to treat his case "with the urgency that it required." (Doc. No. 16 ¶ 27.)

Defendant Bloodgood-Grandy was responsible for supervising both Sigler and Long, but she allegedly failed in this responsibility and failed to recognize that Sigler and Long were not providing adequate care for Addison, leading to his "haphazard and grossly inadequate" mental health care at SCCC. (*Id.* ¶ 28.) Instead of receiving adequate treatment for his psychiatric conditions, Addison was "repeatedly put into disciplinary segregation." (*Id.*)

On the day Addison died, August 23, 2019, he was in a segregation unit in a single-person cell. Defendants Whitehead, Ackerman, Williams, King, Avila, Ratliff, and Ray were all on duty that day; all witnessed Addison's repeatedly stating that he was thinking about killing himself or intended to kill himself. None intervened. Security video from the prison shows that Addison hung a towel over the window to his cell at 7:17 p.m., as a result of which the correctional officers on duty could not perform safety checks on Addison, who by then had been threatening suicide for hours. The defendants allegedly did not discover the towel until 7:52, at which time Addison did not respond to verbal inquiries. (Doc. No. 16 ¶ 30.) Despite the lack of response, the correctional officers did not enter Addison's cell until 8:23 p.m., at which point he was found hanging and could not be revived. (*Id.*)

In the investigations conducted by Special Agent Jordan and Investigator Jessica Frakes, the correctional officer defendants allegedly gave "conflicting answers about what happened on the date of Addison's death." (Doc. No. 16 ¶ 31.) Prison logs reflect that Addison had not been provided any food all day, and the autopsy report confirmed that there was no food in his stomach. The defendants acknowledged that Addison was threatening to kill himself if he was not provided a meal tray. Defendant Ackerman, unit sergeant, believed that Addison was bluffing and did not take his threats seriously. Ackerman was subsequently fired for her role in the incident. (*Id.*)

The plaintiffs allege that Frakes, who is not a defendant, completed a form required by the Prison Rape Elimination Act ("PREA") by answering a number of questions incorrectly, including questions about whether the rape was motivated by a factor such as race, ethnicity, gang affiliation, etc.; what could have been done to prevent the problem from recurring; and whether information was available that should have alerted staff that the incident might occur. (Doc. No. 16 ¶ 32.) The plaintiffs allege that Frakes' report, which "whitewashed" what happened and was signed off on by defendants Johnson and Perry, is "a clear example of the culture of deliberate indifference (and cover-up) fostered by Warden Perry at SCCC and CoreCivic generally." (*Id.*) The plaintiffs allege that the form constitutes evidence of Perry's and Johnson's deliberate indifference to prison rape at SCCC. (*Id.*)

(Doc. No. 67, at 3–7 (footnotes omitted).)

The FAC also alleged that Addison's death resulted from a CoreCivic policy or practice of understaffing and inadequate medical care, reflecting deliberate indifference to inmate health and safety in the interest of maximizing corporate profits. In support of these claims, the FAC included numerous allegations about lawsuits against CoreCivic based on events at facilities around the country dating from 2011 through 2020. (Doc. No. 16 ¶¶ 34–44.)

The defendants filed multiple motions for partial dismissal and, in June 2021, the court granted in part and denied in part these motions. Specifically, the court dismissed the medical malpractice claims against the correctional officer defendants (Perry, Johnson, Ackerman, Whitehead, Williams, Avila, Ratliff, and Ray), on the grounds that these individuals were not alleged to be medical providers and, therefore, could not be liable for medical malpractice. (See Doc. No. 67, at 33.) In addition, the court dismissed without prejudice the medical malpractice claims against CoreCivic and the medical professional defendants (Lyons, Sigler, Long, Steadman,

Turner, and Bloodgood-Grandy), on the basis that the plaintiffs had failed to comply with the pre-suit notice requirement set forth in the Tennessee Health Care Liability Act ("THCLA"), Tenn. Code Ann. § 29-26-121(a)(1). (See Doc. No. 67, at 39.) The court also dismissed the § 1983 claims against CoreCivic, Hininger, Perry, Johnson, Lyons, Long, Sigler, Bloodgood-Grandy, and Turner, leaving intact the § 1983 claim against defendant Steadman, as well as § 1983 claims against defendants Whitehead, Ackerman, Williams, King, Ray, Ratliff, and Avila, who had not moved for their dismissal. The court dismissed all state law claims asserted against Hininger, Perry, Johnson, Lyons, Sigler, Long, Steadman, Turner, and Bloodgood-Grandy, and the sexual assault claim against CoreCivic. (*Id.*; *see also* Doc. No. 70 (Amended Order).)

In other words, as a result of the court's ruling on the partial dismissal motions addressed to the FAC, all claims against defendants Hininger, Perry, Johnson, Lyons, Sigler, Long, Bloodgood-Grandy, and Turner were dismissed. The only remaining claims were, as best the court can tell: the § 1983 claim against Steadman; the § 1983 and state law claims against Whitehead, Ackerman, Williams, King, Ray, Ratliff, and Avila; the state law claims against CoreCivic (except the assault claim); and the assault and wrongful death claims against Rose.

A year later, in June 2022, the plaintiffs filed a Rule 54 Motion for Reconsideration, asking for reconsideration of the dismissal of the medical malpractice claims against CoreCivic, Sigler, Long, Steadman, Turner, Bloodgood-Grandy, and Lyons on the basis of the Sixth Circuit's opinion in *Albright v. Christensen*, 24 F.4th 1039 (6th Cir. 2022), issued in January 2022. The court found that *Albright* constituted an intervening change of controlling law and, therefore, granted the plaintiffs' motion, insofar as it sought the reinstatement of the medical malpractice claims against CoreCivic, Sigler, Long, Steadman Turner, and Bloodgood-Grandy. The court declined to reinstate the claim against Lyons, however, on the basis that the Amended Complaint failed to state a

medical negligence claim against him for which relief could be granted. (Doc. No. 106, at 17.) At the same time, the court also acknowledged that, after filing their Motion for Reconsideration but before the court ruled on it, the plaintiffs had filed their Motion to Amend. They stated in a footnote in their Reply in support of the Motion for Reconsideration that the proposed second SAC filed with the Motion to Amend did not allege additional facts establishing Lyons's liability for medical negligence because they understood that, in light of the court's ruling on the application of the THCLA, any such amendment would have been futile. (Doc. No. 99, at 8.) They also asserted that, if permitted to amend their pleading, they intended to allege additional facts showing medical negligence, as well as simple negligence, on the part of Lyons. (*Id.* at 8–9.) The court stated only that it would address any such new allegations "in the context of ruling on that motion." (Doc. No. 106, at 17; *see also id.* at 4 n.4.)

While briefing on the plaintiffs' Motion to Amend was still underway, the plaintiffs filed an Unopposed Motion to Set Aside Scheduling Order. Based on the Memorandum and Order reinstating the medical malpractice claims, the parties recognized that additional discovery would be required and that, if the court granted the Motion to Amend, "that too would necessitate additional discovery." (Doc. No. 111, at 1.) The plaintiffs therefore moved to "set aside the scheduling order until after the Court has ruled on the July 15, 2022 motion to amend." (*Id.*) On August 18, 2022, the court granted that motion as unopposed, thus effectively suspending any still-pending deadlines. (Doc. No. 114.)

The Motion to Amend has now been exhaustively briefed: Lyons and the CoreCivic defendants filed separate Responses (Doc. Nos. 112, 113); the plaintiffs filed a consolidated Reply (Doc. No. 116), and the CoreCivic defendants, with permission, filed a Surreply (Doc. No. 124).

In addition, in conjunction with their Reply, the plaintiffs filed two sealed exhibits (Doc. Nos. 119, 120), and a Motion for Leave to File Documents Under Seal (Doc. No. 118). In the last paragraph of this motion, the plaintiffs included a single sentence that stated: "Finally, Defendant Lyons was mistakenly omitted from Paragraph 58(a) [of the second SAC], therefore the Plaintiffs move the Court to recognize claims against him as if his name was in that subparagraph." (Doc. No. 118, at 2.) The court granted the Motion for Leave to File Documents Under Seal but found that the request to add Lyons's name to Paragraph 58(a) had to be made in a separate motion that, "pursuant to Local Rule 7.01(a)(1), must reflect the position of opposing counsel with regard to the motion." (Doc. No. 122.)

Thereafter, in response to that Order, the plaintiffs filed the Supplemental Motion. (Doc. No. 125.) In this motion, however, they do not simply request to amend the proposed Second Amended Complaint to add Lyons's name to paragraph 58(a) of the previous version of the Second Amended Complaint. Instead, they state that they "wish to correct the SAC in order to more accurately reflect the contents of those sealed documents" and, separately, "to remove some claims from the SAC in response to some of the issues raised by the Defendants" in their Responses. (Doc. No. 125, at 1.) They express hope that this will "simplify the Court's task" in addressing their Motion to Amend. (*Id.*) In the Supplemental Motion, the plaintiffs highlight some of the changes between the second and third versions of the proposed SAC, as discussed in greater detail below. In conjunction with this motion, the plaintiffs also filed notice that (1) defendant Lyons did not oppose it except insofar is it included proposed changes that concern him; and (2) the other defendants did not oppose dropping claims but opposed the other changes. (Doc. No. 127.) The defendants filed their own Responses to the Supplemental Motion (Doc. Nos. 128, 129), and the plaintiffs filed a Reply to Lyons's Response (Doc. No. 130).

## II.     STANDARD OF REVIEW

"[W]hen a party seeks to amend its pleadings . . . after the expiration of scheduling order deadlines, it must show good cause under Rule 16(b)." *Garza v. Lansing Sch. Dist.*, 972 F.3d 853, 879 (6th Cir. 2020) (citing *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 625 (6th Cir. 2002); Fed. R. Civ. P. 16(b)(4)). "The primary measure of Rule 16's 'good cause' standard is the moving party's diligence in attempting to meet" the scheduling order's requirements, but courts also consider 'possible prejudice to the party opposing the modification.'" *Id.* (quoting *Inge*, 281 F.3d at 625). To be clear, "[w]hile the absence of prejudice to a non-moving party may be relevant in determining whether leave to amend should be granted . . . , it does not fulfill the 'good cause' requirement of Rule 16(b)." *Woodcock v. Ky. Dep't of Corrs.*, No. 5:12-CV-00135-GNS-LKK, 2016 WL 3676768, at *1 (W.D. Ky. July 6, 2016) (citation omitted).

Assuming the movant clears the Rule 16 "good cause" hurdle, the court must then consider whether the proposed amendment is permissible under Rule 15. *Leary v. Daeschner*, 349 F.3d 888, 909 (6th Cir. 2003). Under that rule, the court should "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). Rule 15(a)(2) "embodies a 'liberal amendment policy.'" *Brown v. Chapman*, 814 F.3d 436, 442 (6th Cir. 2016) (citation omitted). To determine whether to grant leave under this liberal policy, courts weigh several factors, including: "[u]ndue delay in filing, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and futility of amendment." *Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 458 (6th Cir. 2001) (citation omitted).

## III.    MOTION TO AMEND SCHEDULING ORDER

The plaintiffs assert that they have good cause to amend the scheduling order. They also contend that the defendants cannot plausibly establish that they will suffer prejudice if the scheduling order is amended to allow the plaintiffs to belatedly amend their pleading again. In

support of their position, the plaintiffs correctly point out that: (1) the granting of the plaintiffs'
Motion for Reconsideration and corresponding reinstatement of the previously dismissed medical
malpractice claims against all of the medical professional defendants (except for Lyons) gave rise
to the need to reopen discovery and to reset discovery-related and other deadlines; and (2) the court
granted the plaintiffs' unopposed motion to set aside the scheduling order as of August 18, 2022,
as a result of which all discovery and trial-related deadlines have been vacated, to be reset
following the resolution of the pending motions.

In addition, the plaintiffs argue that, although the original deadline for amending pleadings
expired on December 4, 2021 (*see* Doc. No. 81, at 3), they did not learn the information that they
seek to set forth in the SAC, specifically relating to the defendants' alleged duty to develop
procedures for notifying guard staff about suicidal inmates, until after the defendants responded to
discovery in March through June 2022. On the basis of this new evidence, the plaintiffs seek to
reinstate claims against some of the defendants against whom all claims were previously
dismissed. The plaintiffs assert that the defendants cannot establish prejudice, given that the
scheduling order has to be amended anyway to account for additional discovery and that several
of the medical official defendants against whom all claims were previously dismissed have already
been rejoined to the lawsuit as a result of the court's ruling on the plaintiffs' Motion for
Reconsideration.

Neither Lyons nor the CoreCivic defendants expressly address Rule 16 and the "good
cause" standard for moving to amend a pleading after the deadline for doing so has passed. Instead,
they only address the merits of that portion of the plaintiffs' motion addressed to amending their
pleading again, thereby waiving any objection based on Rule 16. *Accord Correa v. Rubin Lublin
TN, PLLC*, No. 15-2135, 2015 WL 5232081, at *3 (W.D. Tenn., Sept. 8, 2015 (finding that a

party's failure to address an argument raised in a motion to dismiss amounted to a waiver of the issue).

Moreover, the court finds that the plaintiffs have satisfied their burden of showing good cause to amend the scheduling order, in light of the fact that virtually all of the other deadlines set in the Initial Case Management Order and the Order setting trial deadlines will have to be reestablished. In addition, the plaintiffs have shown that they learned information they seek to add to their pleading in discovery that was not produced until after the expiration of the deadline for amending pleadings.

The court, therefore, will consider the merits of the Motion to Amend under Rule 15.

## IV.     MOTION TO AMEND COMPLAINT

### A.     The Proposed Amendments

While the plaintiffs argue that good cause exists to permit amending the scheduling order and recognize that Rule 15 governs their request to amend their *pleading*, they do not actually address Rule 15's criteria, except to argue that, if permitted to amend in response to "the new evidence" learned from discovery during the spring of 2022, their "case will be considerably stronger, and the Plaintiffs will be able to pursue defendants who otherwise would escape liability for their misconduct." (Doc. No. 102, at 4–5.) They also assert, in a somewhat conclusory fashion, that "the existing Defendants would not be prejudiced by the reinstatement of claims against the defendants who were previously dismissed from this case." (*Id.* at 5.)

Regarding the substance of the proposed amendments, the plaintiffs assert that they learned for the first time, upon receiving the defendants' discovery answers, that: (1) "the guard staff who worked in Addison Smith's unit had never been warned that Addison was at high risk of suicide. Specifically, the guard staff had not been warned that Addison had a history of suicide attempts or that he had just returned from a hospital after he was raped by another inmate" (*id.* at 3); (2)

"Defendants CoreCivic, Perry, Johnson, Bloodgood[-Grandy] and Turner had a legal duty to develop procedures for notifying guard staff about suicidal inmates" and failed to do so (*id.*); and (3) Addison was "placed in the wrong unit for suicidal inmates" (*id.* at 3–4 n. 2).

The plaintiffs assert that this new information is important, because, if "CoreCivic, Perry, Johnson, Bloodgood and Turner [had] adopted adequate procedures for dealing with inmates like Addison, and had Defendants Sigler, Long, and Lyons followed those procedures, then the guard Defendants almost certainly would not have been so dismissive of Addison's suicide threats." (*Id.* at 3–4.) They further argue that this information is relevant because, while all claims against Perry, Johnson, Bloodgood-Grandy, and Turner were previously dismissed, "there is now evidence that they were negligent (and perhaps deliberately indifferent under 42 U.S.C. § 1983)" in failing to adopt protocols for informing guard staff about inmates at heightened risk of suicide. (*Id.* at 4.) They claim that this failure, in addition to making the guards less likely to take Addison's threats of self-harm seriously, also led to Addison's being placed in disciplinary segregation rather than in a medical unit. The plaintiffs assert that, irrespective of how the court ruled on their motion to reinstate the medical malpractice claims, which was at that time still pending, these new allegations establish simple negligence against some of the dismissed medical professional defendants, rather than medical negligence.

The actual changes to the pleading are more comprehensive than suggested by the plaintiffs' Motion to Amend. The court's own analysis reveals that the second SAC differs from the FAC in that it:

> (1) includes new details regarding Addison's history of suicide attempts and other forms of self-harm while incarcerated from 2017 through 2019, as well as new details regarding how long Addison had been off of his psychiatric medications both while at TTCC and after his transfer to SCCF, and asserts that "[n]o competent medical professional" could have looked at his medical history and concluded that

it was a good idea to take him off psychiatric medications "cold turkey." (Doc. No. 102-1 ¶¶ 24–26);

(2) contains new assertions that, if defendant Turner, who was Steadman's supervisor, "had reviewed Addison's file, as was his duty, then he would have seen that Addison was receiving grossly inadequate care" (*id.* ¶ 27);

(3) now alleges that defendant Steadman may have forged Addison's signature on a medication consent form and suggests Addison may never have been seen by Steadman on August 19, 2019 (*id.* ¶ 28);

(4) alleges that CoreCivic personnel improperly classified defendant Rose and that he should never have been placed in a cell with Addison(*id.* ¶ 29);

(5) alleges that Sigler may have forged a form indicating that he saw Addison on August 22, 2019, the day before his death, and suggests Sigler may never have provided treatment for Addison on that day (*id.* ¶ 30);

(6) besides alleging that Lyons never provided mental health services to Addison related to the rape and fabricating records to make it appear that he had done so, the SAC includes an assertion that Lyons's "failure to provide needed mental health services contributed to Addison's death" and that he further "contributed to Addison's death by failing to notify guard staff that Addison was at heightened risk of suicide" (*id.* ¶ 34);

(7) alleges that the plaintiffs learned in April 2022 that none of the defendant corrections officers had been informed that Addison had a history of suicide attempts, was at a high risk for suicide, or had recently returned from a hospital examination for sexual assault (*id.* ¶ 35);

(8) asserts that the plaintiffs learned on March 30, 2022 that Addison was on the "wrong unit" for a suicidal inmate and that he "should have been sent to the facility's medical unit for monitoring rather than being left in disciplinary segregation (*id.*);

(9) alleges that CoreCivic, Perry, Johnson, Bloodgood-Grandy, and Turner failed to comply with TDOC Policy No. 113.88, requiring all Tennessee prisons to develop written procedures for "Referral protocol, including communication procedures, between all health care and correctional staff" and "specific protocol for managing suicidal inmates . . . to include procedures for suicide risk assessment, communication with on-call provider, communication with security staff and documentation," and that the defendants' failure to develop adequate procedures and protocols constituted "deliberate indifference and breach of duty" that "contributed to Addison's death because guard staff were never informed about his heightened risk of suicide" (Doc. No. 102-1 ¶ 36);

(10) alleges that an "unknown medical employee" referred to as "John Doe"[3] evaluated Addison the morning of the day he died; that John Doe "knew Addison's medical and mental health history" and that he had just been raped and returned from the hospital the day before; that Sigler and Lyons should have known that Addison was at a "heightened risk of suicide after his return from the hospital"; and that, given this knowledge, they had a duty to (a) "notify their superiors and to initiate efforts to place Addison in the medical unit designated for suicidal inmates" and (b) "warn the Defendant corrections officers" of the heightened risk of suicide: and their failure to meet these duties contributed to Addison's death (*id.* ¶ 37); and

(11) alleges that, in light of their knowledge of Addison's history and circumstances, John Doe, Sigler, Lyons, and Long also had a "common-sense duty" to notify the guard staff of Addison's history and that their failure to do so contributed to Ackerson's being dismissive of Addison's suicide threats and to Addison's being improperly classified and housed in segregation rather than in the medical unit (*id.* ¶ 40).[4]

In addition, the SAC includes a new paragraph 54 that purports to incorporate by reference the entirety of the complaint, with its exhibits, filed in *Newby v. CoreCivic of Tenn., LLC*, No. 3:22-cv-00093 (M.D. Tenn. Feb. 11, 2022) (Doc. No. 1); the plaintiffs have also attached a copy of this complaint to the second SAC. *Newby*, on its face, "arises from yet another preventable death"—a murder, in that case—"at CoreCivic's 'severely understaffed' Trousdale Turner Correctional Center—Tennessee's most dangerous and notorious prison." *Id.* ¶¶ 1, 10, 15.[5]

---

[3] The plaintiffs have not added John Doe to the case caption or to the list of "Parties" in the SAC, but the "Claims" section of the SAC incorporates references to him, making it unclear whether the plaintiffs seek to add him as a new defendant. (*See, e.g.*, Doc. No. 102-1 ¶ 58(c) ("John Doe and Defendants Sigler, Long, and Lyons failed to notify guard staff that Addison was at high risk of suicide . . . .").)

[4] Although the plaintiffs nowhere acknowledge this change, the SAC also entirely omits any claims against inmate Marcayus Rose and removes his name from the case caption. It also removes the assault claim against CoreCivic that was based on its purported liability for Rose's assault on Addison. It clarifies that the negligence claim against CoreCivic is based on *respondeat superior* liability for the negligence of its employees and specifically for the negligence leading to the rape of Addison by Marcayus Rose, with whom Addison never should have been assigned to share a cell. (Doc. No. 102-1 ¶ 66.)

[5] The court takes judicial notice that *Newby* was dismissed with prejudice on December 2, 2022, pursuant to a Joint Stipulation of Dismissal filed on August 17, 2022.

In addition to the new factual allegations, the second SAC substantially reconfigures the "Claims" section of the pleading by (1) specifying grounds for the § 1983 claims (Doc. No. 102-1 ¶ 58); and (2) clarifying that the medical malpractice claims are asserted only against defendants CoreCivic, Lyons, Long, Sigler, Bloodgood-Grandy, Steadman, and Turner (*id.* ¶ 62). It continues to assert claims against all defendants for wrongful death, gross negligence, and negligence. (*Id.* Counts 2, 4, 5.)

In addition, in their Supplemental Motion, the plaintiffs seek to "correct" the second SAC to "more accurately reflect the contents" of the sealed documents (Doc. Nos. 119, 120). (*See* Doc. No. 125, at 1.) Doc. No. 119 is the SCCF Suicide Prevention Plan, dated February 19, 2019.[6] Defendant Lyons is identified as "Administrator" in the caption of this document; signatures on the document indicate that it was "reviewed and approved" by Lyons, Bloodgood-Grandy, Perry, and Steadman, respectively, as Mental Health Coordinator, Clinical Director, Warden, and APN. The plaintiff's other sealed exhibit is an SCCF "Post Order," which identifies or creates a position for a correctional officer to staff the SCCF medical department and to be "responsible for the overall security of the medical department." (Doc. No. 120, at 1.) It provides, as potentially relevant to the plaintiffs' claims, that the medical department correctional officer is to immediately notify the Shift Supervisor if he is informed that an inmate has been placed on suicide watch. (*Id.*

---

[6] The Suicide Prevention Plan states that there were no documented deaths ruled as suicides in 2018 and two serious suicide attempts in 2018. (Doc. No. 119, at 1.) It identifies the "prevention goal" as "zero in-custody" suicide deaths and attempts in any given year. The Risk Management section of the Plan states very generally where inmates who are "placed on suicide precautions" are to be housed, either with or without constant observation, but it says nothing about but how inmates are placed on "suicide precautions." (*Id.* at 2–3.) It does indicate that all inmates have access to mental health services, that mental health referrals are to be "triaged by one of the Mental Health Coordinators," and that the mental health treatment team "meets weekly to review and discuss cases, complete[] annex evaluations, update treatment plans and make decisions regarding level of care changes and services needs." (*Id.* at 3.) These meetings are to be "documented for review by TDOC or other auditors [as] required by policy." (*Id.*)

at 3.) If an inmate is placed on suicide watch, the Shift Supervisor is to "designate an officer to continuously monitor and record the inmate's behavior." (*Id.*)

The plaintiffs filed these documents[7] in support of their Reply in Support of Motion to Amend, apparently to illustrate that the documents do not include "guidelines for referring inmates to the medical unit for purposes of suicide prevention." (Doc. No. 118, at 1–2.) The plaintiffs seek to incorporate these documents by reference into their pleading. (*Id.* at 2.)

In the Supplemental Motion, The plaintiffs further state that the proposed third SAC will

(1) "withdraw all of the civil rights claims found in Paragraph 58(c), and instead assert them only as common-law tort claims," thus narrowing the number of defendants against whom they bring § 1983 claims (Doc. No. 125, at 2);

(2) "withdraw the civil rights claims against Defendant Turner and assert only medical malpractice claims against him" (*id.*);

(3) "withdraw all of their claims against Defendant Johnson" (*id.*);

(4) add Lyons's name to Paragraph 58(a) but remove defendant Hininger's name (*id.*);

(5) add a sentence to Paragraph 34, as follows: "In his role as the mental health administrator and coordinator for SCCC, Defendant Lyons knew not later than August 20, 2022 that Addison had returned from a hospital evaluation for rape, and that Addison was in need of mental health services as a result" (*id.*); and

(6) modify Paragraph 36 to allege that "CoreCivic's procedures do not provide any guidelines"—instead of providing simply inadequate guidelines—"for assigning inmates to the medical unit on the basis of heightened suicidal risk." (*Id.* at 2–3.) And they seek to add that the defendants' deliberate indifference and negligence thus contributed to causing Addison's death, not only because guard staff were never informed of Addison's heightened risk of suicide, but also because he was not transferred to the medical unit. (*Id.* at 3.)

Although the plaintiffs do not highlight this amendment, they also incorporated substantial changes at Paragraph 62, to identify more specifically that their medical malpractice claim against

---

[7] The plaintiffs obtained permission to file them under seal, because CoreCivic had designated them as confidential.

Turner is based on his failure to adequately supervise Steadman and that the medical malpractice claims against Sigler, Long, and Lyons are premised on, among other deficiencies, their failure to notify guard staff that Addison was at high risk of suicide or to insure that he was housed in the proper unit.

## B.    The CoreCivic Defendants' Objections

The CoreCivic defendants (CoreCivic, Jason Whitehead, Christopher Williams, Joshua Ray, Jenny Ratliff, Ledia Avila, Angela Steadman, J. Scott Long, Mark Sigler, Elena Bloodgood-Grandy, and Kevin Turner, and previously dismissed defendants Damon Hininger, Grady Perry, and Eddie Johnson) argue that the Motion to Amend should be denied (1) pursuant to the law-of-the-case doctrine, because the plaintiffs cannot establish the existence of "substantially different evidence" or other "exceptional circumstances" that would justify bringing back into the case claims that were already dismissed or defendants against whom all claims were previously dismissed; (2) under Rule 15, because the requested amendment is untimely and "constitutes undue delay," would unfairly prejudice the defendants, and would be futile. (Doc. No. 113, at 10, 19–22).[8]

### 1.    Law-of-the-Case Doctrine

The Supreme Court characterizes the law-of-the-case doctrine as an "amorphous concept" that, "[a]s most commonly defined, . . . posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California*, 460 U.S. 605, 618 (1983). The doctrine "directs a court's discretion, it does not limit

---

[8] In response to other arguments by the CoreCivic defendants, the plaintiffs clarify that they do not intend to assert claims against Dr. William Mays or to assert claims against CoreCivic relating to understaffing.

the tribunal's power." *Id.*; *see also* Fed. R. Civ. P. 54(b) ("Any order or other decision . . . that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."). Under this doctrine and Rule 54, "the district court retains the statutory and inherent discretion to resurrect previously dismissed claims and previously dismissed parties should later discovered evidence warrant it." *Ind. State Dist. Council of Laborers & HOD Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 719 F.3d 498, 510 (6th Cir. 2013) (Gwin, D.J., concurring) (citing *Rodriguez v. Tenn. Laborers Health & Welfare Fund*, 89 F. App'x 949, 959 (6th Cir. 2004)), *vacated and remanded on other grounds sub nom. Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 (2015). Such discretion, however, is typically exercised sparingly. *See Christianson v. Colt Indus. Operating Corp*., 486 U.S. 800, 817 (1988) ("[A]s a rule courts should be loathe [sic] to [revisit prior decisions] in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would work a manifest injustice." (internal quotation marks and citation omitted)).

The defendants have cited to one case in which the court applied the law-of-the-case standard to a motion to amend a complaint seeking to reinstate previously dismissed claims based on purportedly new evidence. *McNulty v. Arctic Glacier, Inc.*, No. 08-CV-13178, 2016 WL 465490, at *17 (E.D. Mich. Feb. 8, 2016) ("The Court agrees that Plaintiff's proposed amendments, which seek to reassert the identical antitrust and RICO conspiracy claims that this Court expressly dismissed in its 2009 Orders, must be analyzed under the law of the case doctrine."). Even there, however, the court considered the questions of whether the evidence the plaintiff proffered was truly "new" and whether it served to resuscitate the previously dismissed

claims, effectively merging the law-of-the-case analysis with its analysis under Rule 15 of whether the proposed amendment was futile.

In the present case, the court is not persuaded that application of law-of-the-case doctrine (or Rule 54) is appropriate, at least insofar as the plaintiffs seek to assert (or reassert) claims based on newly discovered evidence. They do not expressly seek reconsideration of the court's previous dismissal of their claims as set forth in the FAC. They already did that, in fact, and the court granted relief with respect to the medical malpractice claims against all but one of the medical professional defendants. Insofar as the plaintiffs now seek to allege additional facts in support of the medical malpractice claims, the law of the case erects no barrier to their doing so, because the court has never ruled on the question of whether the plaintiffs adequately pleaded facts that, if true, would state medical malpractice or simple negligence claims.

Insofar as the plaintiffs seek to reinstate their § 1983 claims, they claim to be in possession of new facts that they purportedly could not have discovered until the defendants responded to their discovery requests and that they contend are sufficient to support renewed claims under § 1983. Under the circumstances presented here, Rule 15 supplies the standard, and the relevant question is whether the defendants have shown, as they argue, undue delay, undue prejudice, or futility.

### 2.    *Rule 15: Undue Delay and/or Undue Prejudice*

Regarding undue delay, the CoreCivic defendants argue that the purportedly "new" evidence is not really new and that the plaintiffs have offered no excuse for having "delayed for years asserting the majority" of the new allegations in the proposed SAC, as most of them arise from medical records that have been in the plaintiffs' possession since August 2020. (Doc. No. 113, at 20.)

The defendants also assert that, when an amendment is requested at a "later stage of litigation," courts often find that such delay alone gives rise to undue prejudice to the non-moving parties. (Doc. No. 113, at 20 (citing, *e.g.*, *Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 834 (6th Cir. 1999) ("[A]llowing amendment after the close of discovery creates significant prejudice[.]"); *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 791 (6th Cir. 2011) (finding that the district court did not abuse its discretion in denying a motion to amend, even where the discovery deadline had not yet closed, where "much else had occurred by that time" and "allowing the amendment would have required the parties and the court to backtrack and redo work that had already been completed")).)

The CoreCivic defendants argue that the prejudicial effect as to previously dismissed defendants is "obvious," when such amendments would permit such defendants to be "dr[agged] back into litigation for which they have not been parties for over a year." (Doc. No. 113, at 21.) They argue that the already participating defendants will be prejudiced, "as they have proceeded over the past year under the assumption" that the dismissed claims and parties would stay dismissed. (*Id.*) They assert that they have altered their defense strategies based on the dismissal of certain claims and defendants and, therefore, would be prejudiced by the reinstatement of the previously dismissed claims and defendants. (*Id.*)

"[O]rdinarily, delay alone will not justify the denial of leave to amend the complaint. Delay, however, will become 'undue' at some point, placing an unwarranted burden on the court, or 'prejudicial,' placing an unfair burden on the opposing party." *Bridgeport Music, Inc. v. Dimension Films*, 410 F.3d 792, 806 (6th Cir. 2005) (internal citations and quotation marks omitted). In this case, although the defendants assert that the new claims are *really* premised on medical records that have long been in the plaintiffs' possession, the plaintiffs filed their Motion

to Amend within a few months of receiving the discovery that they claim justifies amendment. At that time, their Motion for Reconsideration of the dismissal of the medical negligence claims was still pending. The court finds that the delay of a couple of months from their receipt of the discovery of new facts, in light of the overall posture of the case, is not undue: it will not, as contemplated by *Bridgeport Music*, place an unwarranted burden on the court.

Moreover, regarding possible prejudice, this case has not progressed to a "later stage of litigation," contrary to the defendants' suggestion. Although the pleading deadline had already expired, the court granted the parties' Joint Motion to Amend the Initial Case Management Order on March 28, 2022, extending all still extant deadlines by ninety days; at the same time, the court reset the trial date for June 2023. (Doc. Nos. 90, 91.) Thereafter, the plaintiffs filed their Unopposed Motion to Set Aside Scheduling Order, which expressly recognized that, if the court granted their Motion for Reconsideration *or the Motion to Amend*, additional discovery would be required. This litigation, in short, is in its early stages, despite having been filed eighteen months ago and notwithstanding that the parties have exchanged some discovery. Likewise, because not much has happened in the preceding year except for the reinstatement of the medical malpractice claims, the previously dismissed defendants have not been left far behind. The CoreCivic defendants have not shown that they would be unduly prejudiced by the proposed amendment.

### 3. Futility

An amendment is futile when, after including the proposed changes, the complaint still "could not withstand a Rule 12(b)(6) motion to dismiss." *Riverview Health Inst. LLC v. Med. Mut. of Ohio*, 601 F.3d 505, 512 (6th Cir. 2010) (quoting *Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000)). The CoreCivic defendants argue very generally that the proposed amendments would be futile, pointing specifically only to the already dismissed § 1983 claims

against CoreCivic, Hininger and Perry,[9] the dismissed § 1983 and common-law negligence claims against the medical professional defendants, Sigler, Long, Bloodgood-Grandy, and Turner, and the dismissed negligence claims against Steadman.

### a) Count 1: Section 1983 Claim Against CoreCivic

The SAC attempts to reinstate the § 1983 claim against CoreCivic. The only new material in the SAC potentially pertaining to such a claim consists of the plaintiffs' allegations that TDOC policy requires each Tennessee prison to develop written procedures to prevent inmate suicide, including by developing specific procedures for "suicide risk assessment" and "communication with security staff." (Doc. No. 125-1 ¶ 36.) The plaintiffs allege that CoreCivic failed to develop any such procedures for SCCF and specifically failed to "address the need for communications between health care and correctional staff regarding inmates who are (1) at heightened risk of suicide, yet (2) have not been transferred to the medical unit" and further failed to "provide any guidelines for assigning inmates to the medical unit on the basis of heightened suicidal risk." (*Id.*)

In addition to these allegations, the SAC still incorporates the paragraphs relating to lawsuits against CoreCivic arising from incidents at other facilities around the country (*id.* ¶¶ 43–53), and the plaintiffs have now added reference to the Complaint filed in *Newby v. CoreCivic of Tenn., LLC*, No. 3:22-cv-00093 (M.D. Tenn. Feb. 11, 2022) (Doc. No. 1), and have gone so far as to incorporate it by reference *and* attach a copy of it to the proposed SAC. (Doc. No. 125-1 ¶ 54; Doc. No. 125-1, at 24–51.)

Under Count 1, the § 1983 claim against CoreCivic is premised upon the assertion that CoreCivic violated Addison's Eighth Amendment right to be free from cruel and unusual

---

[9] The plaintiffs have agreed that the claims against Johnson should not be revived, and they omitted any claims against him from the third SAC. (Doc. No. 125, at 2; Doc. No. 125-1 ¶ 10.)

punishment, insofar as it acted with deliberate indifference to the possibility of self-harm and suicide when it, among other things, "failed to develop adequate procedures for dealing with inmates at risk for suicide, including procedures for (1) notifying guard staff that an inmate is suicidal and (2) procedures for placing suicidal inmates in the proper housing unit." (*Id.* ¶ 58(a).)

These allegations are substantially different and more concrete than the original allegations in support of the § 1983 claim against CoreCivic, but they fare no better. The plaintiffs' argument, essentially, is that CoreCivic should have developed *better* policies for identifying potentially suicidal inmates, as there is no dispute that a policy regarding the placement and monitoring of suicidal inmates was in place. The problem appears to be that the medical professionals at SCCF failed to recognize that Addison was suicidal or at high risk for suicide. In particular, because the allegedly negligent medical providers failed to recognize that Addison was potentially suicidal, it is not clear how a better policy for referring potentially suicidal inmates would have made a difference. Moreover, the policy produced by the plaintiffs indicates that there were no inmate deaths at SCCF ruled as suicide in 2018, and the plaintiffs have not alleged that there were, in fact, suicides at SCCF that were not ruled as such. Nor have the plaintiffs alleged other facts that, if true, would establish that CoreCivic was *on notice* that its policies were insufficient.

To establish liability based on deliberate indifference, the plaintiffs must allege facts showing that CoreCivic was on notice. CoreCivic cannot be shown to have been deliberately indifferent, for purposes of a § 1983 claim, to a problem that either did not exist or of which it had no notice. *See Winkler v. Madison Cty.*, 893 F.3d 877, 902 (6th Cir. 2018) (reiterating that, to establish the existence of an unconstitutional policy or custom, the plaintiff must present proof of, among other things, "a clear and persistent" pattern of unconstitutional conduct by employees of which the entity had "actual or constructive notice").

The new allegations, including the allegations regarding *Newby*, are not sufficient to state a deliberate indifference claim against CoreCivic under 42 U.S.C. § 1983.

> b) *Count 1: Section 1983 Claims Against Hininger, Perry, Bloodgood-Grandy, Lyons, and Turner*

The same basic allegations support the claims against CEO Hininger, Warden Perry, and the medical professionals who, the plaintiffs claim, were responsible for developing the prison's suicide prevention protocol. The plaintiffs allege that Hininger "failed to supervise the staff at SCCF and ensure that they adopted adequate procedures pursuant to TDOC policies" and that Perry, along with Bloodgood-Grandy, Lyons, and Turner, "failed to develop adequate procedures for dealing with inmates at risk for suicide, including procedures for (1) notifying guard staff that an inmate is suicidal and (2) procedures for placing suicidal inmates in the proper housing unit." (Doc. No. 125-1 ¶¶ 58(a), 58(b).)

In a not-dissimilar case brought by the next of kin of an individual who had committed suicide while in pretrial detention, the Sixth Circuit affirmed summary judgment for a jail warden on the plaintiff's § 1983 claim. There, the plaintiff alleged that the warden had

> abandoned the duties of his position, in the face of actual knowledge of the risk of suicide[,] by fail[ing] to establish policies that would protect inmates at risk of suicide from harm, [fail]ing to train and supervise his staff on how to protect inmates at risk of suicide from harm, and fail[ing] to act on the recommendation that would have effectively mitigated the risk posed by the single barred isolation cells.

*Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472, 487 (6th Cir. 2020) (internal quotation marks omitted). The defendants responded that the warden could not be found deliberately indifferent, because there were no allegations that he had "'completely abdicated' any of his responsibilities but rather merely allegations that he inadequately took steps to mitigate the risk of detainee suicide." *Id.*

The court observed that a supervisor such as the warden may be liable if he "abandon[s] the specific duties of [his] position . . . in the face of actual knowledge of a breakdown in the proper workings of the department." *Id.* (quoting *Winkler*, 893 F.3d at 898). The supervisor must have completely "abdicated his or her job responsibility, and the '*active performance* of the [supervisor's] individual job function' must have directly resulted in the constitutional injury." *Id.* (quoting *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006)) (emphasis in original). Thus, the plaintiff must, at minimum, show that the supervisor "implicitly authorized, approved[,] or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Id.* at 487–88 (quoting Bellamy v. Bradley, 729 F.2d 416, 421 (6th Cir. 1984)). While the supervisor does not have to have "known of the substantial risk to the injured party," he "must have possessed knowledge of potential danger to a particular class of persons." *Id.* at 488.

The plaintiff in *Troutman* did not satisfy these requirements. Although she claimed that the warden performed his duties *inadequately*, for instance, by "failing to put in writing the policy of requiring medical clearance before transfer to solitary," she did not allege that the warden actually "knew the policy was not working and nonetheless completely abdicated his responsibilities," that he "encouraged the specific incident of misconduct or in some other way directly participated in it," or that he "at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Id.* (citations omitted). Insofar as she claimed merely that he "inadequately performed his duties," the court found that "such claims are insufficient for § 1983 supervisory liability." *Id.*

*Troutman* dictates the conclusion here. Although the plaintiffs allege that Perry, Bloodgood-Grandy, Lyons, and Turner failed to develop adequate policies for dealing with inmates at risk for suicide and that Hininger failed to supervise SCCF staff and to ensure that they

adopted adequate procedures pursuant to TDOC policies, they do not allege facts suggesting that these defendants were aware that the existing policy was not working but nonetheless completely abdicated their responsibilities to implement a more comprehensive policy in the face of such knowledge. That is, the plaintiffs do not provide any basis for concluding that these defendants were on notice that the inadequate policy posed a "potential danger to a particular class of persons"—namely, potentially suicidal inmates.

The proposed SAC, therefore, fails to state a § 1983 claim against Hininger, Perry, Bloodgood-Grandy, Lyons, or Turner based on the failure to develop adequate policies for dealing with SCCF inmates at risk for suicide. The Motion to Amend to reinstate the § 1983 claims against these defendants, therefore, will be denied as futile.

### c) Count 1: Other Section 1983 Claims

The plaintiffs' Supplemental Motion notes that, in response to the defendants' objections to the second SAC, they omitted from the third SAC any attempt to reinstate § 1983 claims against "John Doe," Sigler, Long, and Lyons, based on their failure to notify guard staff that Addison was at high risk of suicide or to ensure that Addison was housed in the proper unit. They have also omitted any § 1983 claim against Turner based on his alleged failure to adequately supervise Steadman. (*Compare* Doc. No. 102-1 ¶ 58 *with* Doc. No. 125-1 ¶ 58.) The original Motion to Amend will be denied, insofar as it sought to make these changes.

Further, to be clear: the § 1983 claims against defendants Whitehead, Ackerman, Williams, King, Ray, Ratliff, Avila, and Steadman were never dismissed and have not substantially changed in the new iterations of the plaintiffs' pleading. The defendants do not raise objections to these claims. Thus, insofar as the proposed SAC clarifies the § 1983 claims against these defendants, the Motion to Amend will be granted.

*d) Common-Law Claims*

The CoreCivic defendants object to the "reappearance" of the common-law negligence claims against defendants Sigler, Long, Bloodgood-Grandy, Tuner, and Steadman. (Doc. No. 113, at 22.) They assert that the "common law negligence claim[s]" are really medical malpractice claims based on the defendants' failure to appropriately diagnose Addison as suicidal (Doc. No. 113, at 18–19) and that the reinstatement of these claims would be futile, since they were already dismissed.

However, the negligence claims against these defendants were previously dismissed because, as the plaintiffs recognized, they were subsumed by the medical malpractice claims and, like the malpractice claims, were subject to dismissal based on the plaintiffs' failure to comply with the procedural requirements of the THCLA. (*See* Doc. No. 51, at 13.) The court has now ruled that the THCLA does not apply, as a result of which the statute no longer creates a barrier to ordinary negligence claims either. Accordingly, the defendants have not shown that amendment of the SAC to incorporate additional allegations in support of the common-law negligence claims against defendants Steadman, Long, Sigler, Bloodgood-Grandy, or Turner would be futile.

The court will grant the plaintiffs leave to amend to restate the medical malpractice claims (which have already been reinstated), to reinstate the other state law claims, and to allege the proposed new facts to support these claims.

**C.      Lyons' Objections**

William Lyons and Ashley Ackerman have filed a separate response. In addition to arguing that the plaintiffs' Motion to Amend should be denied under the law-of-the-case doctrine (or alternatively under Rule 54, which imposes basically the same standard) and on the basis that the Motion to Amend was unduly delayed—arguments the court has already rejected—Lyons and Ackerman also argue that the proposed amendment would be futile as to Lyons and unduly

prejudicial to both of them. The court finds that the proposed amendment would be futile and does not reach the defendants' other arguments.

The allegations in the third SAC pertaining to Lyons are as follows:

18.    Defendant William Lyons was a mental health counselor at SCCC at all times relevant. He was assigned to care for Addison.

. . . .

34.    After Addison was raped by Inmate Rose on August 19, 2019, Defendant Lyons was supposed to provide mental health services related to the rape. He did not. After Addison died, Defendant Long caught Defendant Lyons fabricating records to make it appear that he met with Addison after the rape. Defendant [Lyons][10] was confronted by CoreCivic's internal investigators, and he was allowed to resign. His failure to provide needed mental health services contributed to Addison's death. Likewise, he contributed to Addison's death by failing to notify guard staff that Addison was at heightened risk of suicide. In his role as the mental health administrator and coordinator for SCCC, Defendant Lyons knew no later than August 20, 2022 that Addison had returned from a hospital evaluation for rape, and that Addison was in need of mental health services as a result.

. . . .

36.    Tennessee Department of Correction ("TDOC") Policy No. 113.88 requires each prison – including private prisons like SCCC – to develop written procedures to prevent suicide. Those written procedures are, among other things, supposed to include the following:

> Referral protocol, including communication procedures, between all health care and correctional staff. Specific protocol for managing suicidal inmates during evening and morning watch and on weekends to include procedures for suicide risk assessment, communication with on-call provider, communication with security staff and documentation.

. . . . Lyons [and others] were directly responsible for developing procedures on behalf of SCCC in response to Policy No. 113.88. They failed to develop adequate procedures to deal with inmates like Addison, and their . . . breach of duty contributed to his death because (1) guard staff were never informed about his heightened risk of suicide and (2) he was not transferred to the medical unit.

37.    TDOC Policy No. 113.31 requires corrections facilities to medically evaluate each inmate who is in administrative segregation (as Addison was) every day. . . . Lyons should have known that Addison was at heightened risk of suicide

---

[10] The SAC says "Long," but it is apparent from context that it should say "Lyons" here.

after his return from the hospital. Given the heightened risk of suicide, . . . Lyons [and others] each had a duty to notify their superiors and initiate efforts to place Addison in the medical unit designated for suicidal inmates. Likewise, . . . Lyons [and others] each had a duty to warn the Defendant correction officers in the segregation unit that Addison was at heightened suicide risk . . . . Lyons [and others] failed to meet both duties. FN2 This contributed to ... Addison's death.

FN2: As set forth previously herein, Defendant[] . . . Lyons fabricated documents indicating that [he] had [a] session[] with Addison. Accordingly, the Plaintiffs' claims against [him] do not arise solely from medical malpractice. . . . Lyons's failure to notify guard staff was not the result of a misapprehension of Addison's psychological condition, but a failure to meet with Addison at all. Even apart from the failure to meet with Addison, the entire mental health team failed to notify guard staff about (1) Addison's prior mental health history and (2) his recent return from the hospital. Likewise, . . . Lyons failed to relay information that would allow classifications staff to properly classify Addison and assign him to the correct unit. One need not be a mental health professional to know that guard staff and classifications staff should have been informed.

40. As explained previously, Addison had a long history of self-injury and suicide attempts, and he had recently alleged that he was sexually assaulted by a cellmate. . . . Lyons [and others] had a common-sense duty (independent of any statutory or professional duty) to notify the Defendant guard staff. Any layperson would know that guard staff and classifications personnel should have been informed of Addison's history. Had . . . Lyons [and others] met their respective duties, then Ackerman likely would not have been so dismissive of Addison's suicide threats and (2) Addison would have been classified properly and housed in the medical unit. Under either scenario, Addison would not have died.

(Doc. No. 125-1 (one footnote omitted).)

Based on these allegations, the SAC asserts a § 1983 claim against Lyons based on his failure to develop adequate protocols and procedures for identifying and dealing with inmates at heightened suicide risk, which is futile, as set forth above. In addition, it asserts or reasserts medical malpractice and negligence claims against Lyons based on the allegations that he

failed to notify guard staff that Addison was at high risk of suicide, and . . . failed to insure that Addison was housed in the proper unit. Even without a written policy or procedure, common sense and professional duty required [him] to take these steps.

(Doc. No. 125-1 ¶ 62; *see also id.* ¶¶ 64, 66.)

Regarding this claim, Lyons argues that, like the FAC, the SAC fails to allege that Lyons ever actually treated or came into contact with Addison and, as a result, fails to state a claim based on the negligent provision of medical care or, indeed, any claim based on negligence. (*See* Doc. No. 112, at 12.) Likewise, as the court already ruled, falsifying records *post facto* to make it appear that he had treated Addison prior to his suicide may have been "morally reprehensible," but it cannot be said to have caused his death. (*See* Doc. No. 67, at 22.)

The plaintiffs respond that the SAC simply states "the obvious": Lyons' "failure to provide mental health services to Addison was a contributing factor in Addison's death." (Doc. No. 116, at 5 (citing Doc. No. 125-1 ¶ 34).) They argue that, when an inmate like Addison has a long history of self-harm and suicide attempts and has just recently returned from a hospital evaluation for alleged rape, "it is entirely reasonable to infer that the inmate would be experiencing extraordinary emotional distress[,] . . . would be at heightened risk of self-harm and . . . would need mental health services to reduce the chances of self-harm." (*Id.* at 9–10.) They assert that Lyons' "neglect of his client" constituted both a breach of duty and gives rise to a claim for medical malpractice, simple negligence, or both. They also assert that this "neglect" led to another breach: Lyons' failure to notify the guard staff of Addison's heightened risk of suicide. "Either way," they conclude, " jurors could reasonably conclude that Defendant Lyons's dereliction was a proximate cause of Addison's death." (*Id.* at 10.)

Regarding Lyons' argument that he cannot be held liable, because there are no credible allegations that he had subjective knowledge that Addison was at risk for suicide, the plaintiffs respond that the facts that (1) Lyons was "supposed to provide mental health services to Addison"; (2) he did not; (3) he falsified a record to make it appear that he had; and (4) he resigned when the falsification was brought to light, together give rise to a reasonable inference that Lyons knew that

he had a duty to Addison and breached that duty—otherwise, why would he have fabricated evidence to make it appear that he had actually seen Addison? (Doc. No. 116, at 11.)

> Under Tennessee law, to plead negligence a plaintiff generally must allege:
>
> (1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate, or legal, causation.

*Staples v. CBL & Assocs.*, 15 S.W.3d 83, 89 (Tenn. 2000). Whether the defendant owed the plaintiff a duty of care is a question of law to be determined by the court. *Id.*

> The Tennessee courts, however, distinguish between "misfeasance" and "nonfeasance"—
>
> that is to say, between active misconduct working positive injury to others and passive inaction or a failure to take steps to protect them from harm. The reason for the distinction may be said to lie in the fact that by "misfeasance" the defendant has created a new risk of harm to the plaintiff, while by "nonfeasance" he has at least made his situation no worse, and has merely failed to benefit him by interfering in his affairs.

*Satterfield v. Breeding Insulation Co.*, 266 S.W.3d 347, 356 (Tenn. 2008) (quoting W. Page Keeton, Prosser & Keeton on the Law of Torts ("Prosser & Keeton") § 56, at 373 (5th ed. 1984)). "In general, an individual has a duty to others to refrain from engaging in misfeasance," defined as "affirmative acts that a reasonable person 'should recognize as involving an unreasonable risk of causing an invasion of an interest of another' or acts 'which involve[] an unreasonable risk of harm to another.'" *Giggers v. Memphis Hous. Auth.*, 277 S.W.3d 359, 364 (Tenn. 2009) (quoting Restatement (Second) of Torts §§ 284, 302 (1965)); *see also Satterfield*, 266 S.W.3d at 355 ("The core of negligence is the violation of this requirement [to exercise reasonable care] by engaging in 'behavior which should be recognized as involving unreasonable danger to others.'" (quoting Prosser & Keeton § 31, at 169)). However, Tennessee courts generally do not impose an "affirmative duty to act to prevent another from sustaining harm," except when a "special relationship" exists between the defendant and the endangered person, which "creates a

sufficiently significant obligation that there is an enforceable expectation of reasonable action rather than unreasonable indifference." *Id.* at 360, 359 (citations omitted). Such a special relationship may arise "where the plaintiff is particularly vulnerable and dependent upon the defendant who, correspondingly, has some control over the plaintiff's welfare." *Kockelman v. Segal*, 71 Cal. Rptr. 2d 552, 557 (Cal. Ct. App. 1998) (citing (Prosser & Keeton, Torts (5th ed.1984) § 56, p. 374)). The relationship between a therapist or psychiatrist and a patient may qualify as such a "special relationship." *Id.* (citations omitted).

Regardless of whether CoreCivic, having custody of Addison, was in such a special relationship with him, the question here is whether *Lyons* was in such a special relationship. The court finds that there are no allegations in the SAC that would support the existence of such a special relationship. Aside from the plaintiffs' entirely speculative assertion that Lyons, "[i]n his role as the mental health administrator and coordinator for SCCC, . . . knew no later than August 20, 2022 that Addison had returned from a hospital evaluation for rape, and that Addison was in need of mental health services as a result" (Doc. No. 125-1 ¶ 34), the plaintiffs do not allege that Lyons had established a treatment relationship with Addison or that he had actual knowledge—whether from speaking with him or reviewing his medical records—that Addison was suicidal, potentially suicidal, or at some heightened risk of suicide. They have not alleged facts that, if true, would establish that a patient-clinician relationship had been formed between Lyons and Addison. As a result, allegations of Lyons' simple nonfeasance—his failure to see Addison when he was apparently "supposed to" or to otherwise act to prevent his suicide—do not support a negligence claim against him. *Accord* Restatement (Second) of Torts § 314 (2006) ("The fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action."). Quite simply, there was no relationship

between Lyons and Addison and, therefore, no special relationship. *See Kockelman*, 6 71 Cal. Rptr. 2d at 556–59 (in a case involving a treating psychiatrist and a suicidal patient, recognizing that, "[u]nder traditional tort law principles, a person is not ordinarily liable for the actions of another and is under no duty to protect another person from harm" but also that "the requisite special relationship does exist in the case of a patient under the care of a psychiatrist" and that "a psychiatrist *who knows that his patient is likely to attempt suicide* has a duty to take preventive measures" (citations omitted) (emphasis added)). As a matter of law, in the absence of a special relationship between them, Lyons did not have a duty to act to prevent Addison's suicide and cannot be liable under a negligence theory for his failure to take some action.

The same rationale applies to Lyons' purported duty and breach of duty to notify guard staff that Addison was at heightened risk of suicide or to insure that Addison was moved to the appropriate unit for potentially suicidal inmates. As a matter of law, Lyons incurred no such duty. Aside from the fact that no special relationship existed, the SAC fails to allege facts suggesting that Lyons ever actually looked at Addison's medical records or was on notice that Addison was at a heightened risk of suicide, prior to the event itself. Regardless of whether he might have incurred a duty to act if he had had such knowledge, to attempt to hold him liable for failing to warn others of an eventuality of which he himself had no advance notice is a bridge too far. Likewise, he had no duty to insure that Addison was moved to a different unit when he had no knowledge of the basis for moving him to a different unit. Amending the complaint to allege negligence claims against Lyons premised upon the failure to warn and the failure to place Addison in a different unit would be futile.

In sum, the court finds that the proposed SAC fails to state a claim against Lyons for which relief may be granted based on § 1983, medical malpractice, or negligence. The Motion to Amend will be denied, insofar as it seeks to reinstate any claims against Lyons.

## V.    CONCLUSION

For the reasons set forth herein, the plaintiffs' Motion to Amend and Supplemental Motion will be granted in part and denied in part. An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge