# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

|  |  |
|---|---|
| **JOHN SMITH and SOYNIA SMITH**, individually and as survivors and next of kin of **ADDISON SMITH**, deceased,<br><br>        Plaintiffs,<br><br>vs.<br><br>**CORECIVIC, INC., JASON WHITEHEAD, ASHLEY ACKERMAN, CHRISTOPHER WILLIAMS, LOGAN KING, JOSHUA RAY, JENNY RATLIFF, LEDIA AVILA, J. SCOTT LONG, MARK SIGLER, ELENA BLOODGOOD-GRANDY-GRANDY, ANDREA STEADMAN, and KEVIN TURNER,**<br><br>        Defendants | **Case No. 3:20-cv-00563**<br><br><br>**JURY DEMAND** |

## SECOND AMENDED COMPLAINT

NOW COME John Smith and Soynia Smith, the Plaintiffs herein, stating and alleging as follows:

## Introduction

1. The Plaintiffs' 27-year-old son, Addison Smith, committed suicide on August 23, 2020, four days after he was raped by another inmate in the South Central Correctional Center ("SCCC"), a private prison in Clifton, Tennessee operated by Defendant CoreCivic, Inc. Addison had a history of mental health problems dating back to childhood and he had threatened suicide multiple times prior to his death. The rapist, Marcayus Rose, was sent to segregation ironically because other inmates in general population reported that Inmate Rose was harassing them for sex. Inmate

- 1 -

Rose is a high-ranking member of the Gangster Disciples and, for reasons yet unexplained, he was assigned to the same cell as Addison despite Addison's obvious vulnerabilities.

2. After filing their Original Complaint, the Plaintiffs served a subpoena duces tecum on the Tennessee Department of Corrections ("TDOC"). On August 12, 2020 and August 18, 2020, TDOC produced records revealing the rape described above, plus equally troubling information concerning Addison's death. The Plaintiffs incorporate by reference the investigative report of TDOC Special Agent Nicky Jordan (Dkt. #16-1) as well as the internal report of CoreCivic Investigator Jessica Frakes (Dkt. #16-2). As shown by TDOC records as well as CoreCivic's own records, CoreCivic personnel repeatedly ignored Addison's stated intent to kill himself, failed to provide him with mental health care, and even failed to provide him with food. Shortly after Addison's death, multiple CoreCivic employees tampered with records in order to hide their negligence or misconduct. Less than three weeks after Addison's death, CoreCivic supervisors up to and including the warden signed off on a report that whitewashed many of the failures that resulted in Addison's rape and, ultimately, his suicide.

## Jurisdiction and Venue

3. This Court has jurisdiction under 28 U.S.C. § 1331 because the Plaintiff asserts federal claims under 42 U.S.C. § 1983.

4. Venue is proper in this Court because some of the Defendants reside or are located in the Middle District of Tennessee, and the acts giving rise to this lawsuit occurred in the Middle District of Tennessee.

## Parties

5. Plaintiff John Smith is the father of Addison Smith, an inmate who committed suicide at the South Central Correctional Center ("SCCC"), a private prison in Clifton, Tennessee. He

asserts claims individually and as Addison's survivor and his next of kin.

6. Plaintiff Soynia Smith is the mother of Addison Smith. She asserts claims individually and as Addison's survivor and his next of kin.

7. Defendant CoreCivic, Inc. is a private prison company headquartered in Nashville, Tennessee.

8. Defendant Jason Whitehead was a correctional officer at SCCC at all times relevant. He was the captain on duty when Addison died.

9. Defendant Ashley Ackerman was a correctional officer at SCCC at all times relevant. She was the sergeant overseeing Addison's unit when Addison died.

10. Defendant Christopher Williams was a senior correctional officer at SCCC at all times relevant. He was working in Addison's unit when Addison died.

11. Defendant Logan King was a correctional officer at SCCC at all times relevant. He was working in Addison's unit when Addison died.

12. Defendant Joshua Ray was a correctional officer at SCCC at all times relevant. He was working in Addison's unit when Addison died.

13. Defendant Jenny Ratliff was a correctional officer at SCCC at all times relevant. She was working in Addison's unit when Addison died.

14. Defendant Ledia Avila was a correctional officer assigned to SCCC at all times relevant. She was working in Addison's unit when Addison died.

15. Defendant J. Scott Long was a mental health counselor at SCCC at all times relevant, and he also provided mental health services to Addison.

16. Defendant Mark Sigler, Ph.D., is a clinical psychologist at SCCC who was assigned to care for Addison.

17. Defendant Elena Bloodgood-Grandy, Ph.D., is a clinical psychologist who oversees mental healthcare at SCCC.

18. Defendant Andrea Steadman is a psychiatric nurse practitioner who was assigned to care for Addison.

19. Defendant Kevin Turner, M.D., is a psychiatrist who oversees mental health care at SCCC. He was responsible for supervising Defendant Steadman at all times relevant.

**Facts**

20. In July 2019, Addison was transferred from TTCC to SCCC. Both facilities are owned and operated by CoreCivic. Prior to the transfer, Addison had a documented history of suicide attempts, self-injury, and hallucinations dating back to childhood. A discharge summary from Addison's TDOC medical records dated July 11, 2017 indicates a "suicidal attempt, suicidal plan." A discharge summary dated May 11, 2018 reports that Addison tried to hang himself while housed in the Sevier County Jail. A TDOC Chronic Disease Treatment form dated August 19, 2018, records a quote, "I'm a cutter I'm not going to lie," and an observation, "he has noted cut marks to forearms." On a TDOC Health History form completed on August 24, 2018, Addison indicated that he suffered from mental illness, that he "tried harming [himself] and heard voices," and that he had been treated in a mental health clinic or psychiatric hospital in July 2018. On May 26, 2019, Addison was placed on suicide watch because he made statements to medical staff about killing himself. On June 2, 2019, Addison was sent to Trousdale Hospital after he deliberately inflicted injuries upon himself.

21. On July 23, 2019, after his transfer to SCCC, Addison was seen by a mental health counselor, and Addison reported that he had been off his psychiatric medications for two weeks. According to records obtained by the Plaintiffs on April 8, 2022, however, a nurse practitioner

- 4 -

discontinued all of Addison's psychiatric medications on May 26, 2019, thus Addison had gone without medication for significantly longer. The medical records indicate that Addison asked to go back on his medications the next day, but CoreCivic personnel at TTCC ignored his request. Those records further indicate that Dr. William Mays met with Addison on June 10, 2019, noted that Addison was not taking medication, but wrote that Addison did not need medication.

22. No competent medical professional could have looked at Addison's medical history as of June 10, 2019 and concluded that discontinuation of all medication– much less *abrupt* discontinuation of all medication – was reasonable medical care. "Cold turkey" discontinuation of some of those medications creates torment for the patient.

23. After the July 23, 2019 meeting referenced above, the mental health counselor at SCCC made a referral to the facility's psychiatric nurse practitioner, Defendant Steadman. Two days later, a nurse separately referred Addison to Defendant Steadman. According to a record signed by Defendant Steadman, she did not meet with Addison until August 19, 2019, *i.e.*, nearly a month after he was reported to be off his medications, and only four days before he killed himself. The failure to provide Addison with his medication caused additional, needless suffering, and it contributed to his suicide. Defendant Turner was supposed to be supervising Defendant Steadman, but he failed to prevent her malpractice and gross negligence. If Defendant Turner had reviewed Addison's file, as was his duty, then he would have seen that Addison was receiving grossly inadequate mental health care.

24. On April 8, 2022, the Plaintiffs obtained a copy of the foregoing record from Defendant Steadman dated August 19, 2019, *i.e.*, the one that was purportedly signed by both Addison and Defendant Steadman. In that document, Addison ostensibly consented to receive psychotropic medications from Defendant Steadman. Addison's signature, however, appears to have been

forged. On information and belief, the Plaintiffs allege that Defendant Steadman or someone acting at her behest forged Addison's signature to make it appear that he had been seen by Defendant Steadman when, in reality, he had not been seen by her at all.

25. In mid-August of 2019, Inmate Rose was transferred to the segregation unit at SCCC because he had been harassing other inmates for sex. On August 19, 2019, Rose coerced Addison into unwanted sex acts by making threats and by telling Addison that he was a ranking member of the Gangster Disciples. Later that day, Addison reported the sexual assault to a guard, and he was transported to a local hospital for an evaluation. CoreCivic personnel improperly classified Inmate Rose, because Addison never should have been placed in the same cell with him.

26. On August 22, 2019, the day before Addison's death, he was supposedly evaluated by Defendant Sigler, a clinical psychologist and a mental health supervisor at SCCC. On the report form, Defendant Sigler did not answer questions about whether Addison had a history of suicidal behavior, whether Addison was taking psychiatric medications, whether Addison had a history of drug abuse, nor whether Addison had a history of psychiatric treatment. Instead, Defendant Sigler put a question mark in between the "yes" and "no" boxes. The evaluation form was not signed until August 26, 2019, *i.e.*, four days after the evaluation and three days after Addison's death; thus it appears that the August 26, 2019 evaluation form may have been a forgery, and it is uncertain whether Defendant Sigler saw Addison at all.

27. In the notes section of the August 26, 2019 evaluation form, Defendant Sigler claimed that he had not been able to access Addison's medical records. Two weeks earlier, however, Defendant Sigler and Defendant Long had signed off on an identical form stating that the answer was "no" to the same questions. Three of the four answers in the August 12, 2019 form were wrong, because Addison did have a history of suicidal behavior, he did have a history of psychiatric

- 6 -

treatment, and he <u>did</u> have a history of drug abuse. On July 23, 2019, the same form had yet another set of answers to the same questions, but that time the answers were correct. The form was signed by Defendant Sigler and Defendant Long. The Plaintiffs allege that Defendants Sigler and Long were not even looking at Addison's mental health history, and they did not familiarize themselves with his case; ergo his case was not being treated with the urgency that it required.

28. If Defendants Sigler and Long had (1) familiarized themselves with Addison's long history of suicide attempts; (2) provided him with adequate mental health care; and/or (3) notified guard staff that Addison was at heightened risk of suicide, then Addison's suicide could have been prevented.

29. Defendant Bloodgood-Grandy is responsible for overseeing mental healthcare at SCCC, and she failed to supervise Defendants Sigler and Long. A quick review of their records would have shown that they were not providing adequate care for Addison. As a result of Defendant Bloodgood-Gandy's failure to supervise, Addison's mental healthcare was haphazard and grossly inadequate. CoreCivic's own records show that Addison was put into disciplinary segregation rather than being treated for his severe and ongoing mental health problems. At the time of his death, Addison was in disciplinary segregation rather than a medical observation unit.

30. After Addison was raped by Inmate Rose on August 19, 2019, Mr. Lyons was supposed to provide mental health services related to the rape. He did not. After Addison died, Defendant Long caught Mr. Lyons fabricating records to make it appear that he met with Addison after the rape. Defendant Long was confronted by CoreCivic's internal investigators, and he was allowed to resign. His failure to provide needed mental health services contributed to Addison's death. Likewise, he contributed to Addison's death by failing to notify guard staff that Addison was at heightened risk of suicide. In his role as the mental health administrator and coordinator for SCCC,

- 7 -

Mr. Lyons knew not later than August 20, 2022 that Addison had returned from a hospital evaluation for rape, and that Addison was in need of mental health services as a result.

31. Between March 30, 2022 and April 18, 2022, *i.e.*, after the filing of the First Amended Complaint, the Plaintiffs learned from interrogatory responses that none of the Defendant corrections officers had been informed (1) that Addison had a history of suicide attempts; (2) that he was at high risk for suicide; or (3) that he had recently returned from a hospital examination for sexual assault. Even after Addison returned from the hospital the day before his death, the Defendant corrections officers were not warned of his risk for suicide. On March 30, 2022, in another interrogatory response, the Plaintiffs learned that Addison had been placed in the wrong unit for a suicidal inmate. Addison should have been sent to the facility's medical unit for monitoring, but instead he was left in disciplinary segregation.

32. Tennessee Department of Correction ("TDOC") Policy No. 113.88 requires each prison – including private prisons like SCCC – to develop written procedures to prevent suicide. Those written procedures are, among other things, supposed to include the following:

> Referral protocol, including communication procedures, between all health care and correctional staff. Specific protocol for managing suicidal inmates during evening and morning watch and on weekends to include procedures for suicide risk assessment, communication with on-call provider, communication with security staff and documentation.

After learning from the Defendant correctional officers between March 30, 2022 and April 18, 2022 that they were unaware of Addison's heightened risk of suicide, the Plaintiffs reviewed the documents produced by Defendant CoreCivic during discovery and could not find any of the procedures required by the TDOC policy. On June 22, 2022, the Plaintiffs made Defendant CoreCivic aware of the fact that they could find no such procedures, and on July 1, 2022 Defendant CoreCivic responded. The Plaintiffs contend that those procedures are facially inadequate. The

procedures only address inmates who have been assigned to the SCCC medical unit. Nowhere in its procedures does Defendant CoreCivic address the need for communications between health care and correctional staff regarding inmates who are (1) at heightened risk of suicide, yet (2) have not been transferred to the medical unit. Furthermore, CoreCivic's procedures do not provide any guidelines for assigning inmates to the medical unit on the basis of heightened suicidal risk. According to documents obtained by the Plaintiffs, Defendants Perry, Steadman, Bloodgood-Grandy, and Turner were directly responsible for developing procedures on behalf of SCCC in response to Policy No. 113.88. They failed to develop adequate procedures to deal with inmates like Addison, and their deliberate indifference and breach of duty contributed to his death because (1) guard staff were never informed about his heightened risk of suicide and (2) he was not transferred to the medical unit.

33. TDOC Policy No. 113.31 requires corrections facilities to medically evaluate each inmate who is in administrative segregation (as Addison was) every day. On April 8, 2022, the Plaintiffs obtained a copy of a log indicating that an unknown medical employee (hereinafter "John Doe") evaluated Addison during the morning of the day that Addison died. John Doe knew Addison's medical and mental health history, including the history of self-injury and suicide attempts as well as the fact that Addison had been raped and had just returned from the hospital the previous morning. Likewise, Defendant Sigler and Mr. Lyons should have known that Addison was at heightened risk of suicide after his return from the hospital. Given the heightened risk of suicide, John Doe and Defendants Sigler and Long each had a duty to notify their superiors and initiate efforts to place Addison in the medical unit designated for suicidal inmates.[1] Likewise, John Doe and Defendants Sigler and Long each had a duty to warn the Defendant correction

---

[1]  TDOC Policy No. 404.10 specifically required John Doe to notify the warden, *i.e.*, Defendant Perry.

officers in the segregation unit that Addison was at heightened suicide risk of suicide. John Doe and Defendants Sigler and Long failed to meet both duties.[2] This contributed to Addison's death.

34. As set forth in Agent Jordan's report and Investigator Frakes's report, Defendants Whitehead, Ackerman, Williams, King, Ray, Ratliff, and Avila were correctional officers on duty the day that Addison died. Despite Addison's repeated statements throughout the afternoon and evening of August 23, 2020 that he was thinking about killing himself or intending to kill himself, they did not intervene. Video from the prison shows that Addison hung a towel over the window to his cell at 7:17 p.m. As a result, the Defendant guards and supervisors were unable to perform safety checks on Addison, who had already been threatening suicide for hours. The Defendant guards did not even discover the towel until 7:52 p.m., and Addison did not respond to their verbal inquiries. Despite the clear and imminent danger, the Defendant guards and supervisors did not make entry to Addison's cell until 8:23 p.m., when he was found hanging. By then, Addison could not be revived.

35. In the reports of Agent Jordan and Investigator Frakes, Defendants Whitehead, Ackerman, Williams, King, Ray, Ratliff, and Avila gave conflicting answers about what happened on the date of Addison's death. According to prison logs, Addison had not been provided any food the entire day. Agent Jordan noted that the Defendants gave conflicting accounts about whether Addison had been provided food, but the Defendants acknowledged that Addison had been

---

[2] As set forth previously herein, Defendants Sigler and Lyons fabricated documents indicating that they had sessions with Addison. Accordingly, the Plaintiffs' claims against them do not arise solely from medical malpractice. Defendants Sigler's and Lyons's failure to notify guard staff was not the result of a misapprehension of Addison's psychological condition, but a failure to meet with Addison at all. Even apart from the failure to meet with Addison, the entire mental health team failed to notify guard staff about (1) Addison's prior mental health history and (2) his recent return from the hospital. Likewise, Defendants Sigler and Lyons failed to relay information that would allow classifications staff to properly classify Addison and assign him to the correct unit. One need not be a mental health professional to know that guard staff and classifications staff should have been informed.

- 10 -

threatening to kill himself if he was not provided a meal tray. According to the autopsy report, no food was found in Addison's stomach. Defendant Ackerman, a supervisor, admitted that she thought Addison was bluffing when he threatened to kill himself, therefore she did not take his threats seriously. She was terminated by CoreCivic, but none of the other guards or supervisors were terminated.

36. As explained previously, Addison had a long history of self-injury and suicide attempts, and he had recently alleged that he was sexually assaulted by a cellmate. John Doe and Defendants Sigler and Long had a common-sense duty (independent of any statutory or professional duty) to notify the Defendant guard staff. Any layperson would know that guard staff and classifications personnel should have been informed of Addison's history. Had John Doe and Defendants Sigler and Lyons met their respective duties, then (1) Defendant Ackerman likely would not have been so dismissive of Addison's suicide threats and (2) Addison would have been classified properly and housed in the medical unit. Under either scenario, Addison would not have died.

37. Investigator Frakes's investigative report on the rape is a clear example of the culture of deliberate indifference (and cover-up) fostered by Defendant Warden Perry at SCCC and by CoreCivic generally. The standard form completed by Ms. Frakes included a list of questions. Question 1 asked whether the rape was motivated by things such as race, ethnicity, gang affiliation, etc., and if the answer was "yes," what could be done to prevent the problem from reoccurring. Ms. Frakes simply answered "No." In reality, her own records showed that Addison, a white male, reported that he was raped by a senior leader of an African-American criminal gang. Question 2 asked, "Was any information available that should or could have alerted staff that the incident may occur?" She answered "No" despite the fact that Inmate Rose had been put into segregation

*precisely because* he was pressuring other inmates for sex. Most of her remaining answers are comparably absurd, yet the whitewash / report was approved by Defendant Johnson and Defendant Perry on September 11, 2019. Such reports are mandated by federal law in the Prison Rape Elimination Act, and they are designed to reduce the number of future sexual assaults. Yet Ms. Frakes, Defendant Johnson and Defendant Perry treated the whole thing like a joke. In other words, Defendants Johnson and Perry are deliberately indifferent to prison rape at SCCC.

38. Agent Jordan was so appalled by what he discovered that he referred Defendant Ackerman and Mr. Lyons to Brent A. Cooper, the district attorney for Wayne County, for criminal prosecution. Unfortunately, Mr. Cooper has shown no interest in the case. CoreCivic's prisons are primarily located in rural counties, and they are often one of the largest local employers, which may explain why Mr. Cooper is not interested. Furthermore, Tennessee's small-town prosecutors generally do not care whether an inmate's death was the result of a crime.

39. Mr. Smith's death was part of a pattern. Prior to his death, CoreCivic paid millions in settlements around the United States because (1) it routinely understaffed its correctional facilities, inevitably resulting in anarchy, assault, murder, and suicide; and (2) it routinely failed to provide adequate medical and mental health care to inmates. The understaffing is particularly problematic because criminal gangs are practically running many of CoreCivic's facilities, including SCCC. Dangerous gang members like Rose are not properly segregated from other inmates, resulting in more assaults and sexual assaults. Inmates have further alleged that some of CoreCivics guards belong to the same criminal street gangs as some of the inmates.

40. In 2016, CoreCivic and its directors were sued by company shareholders because, among other things, the company misrepresented its pattern of understaffing and poor medical care, which ultimately led the Federal Bureau of Prisons to cancel its business relationship with

- 12 -

Core Civic. Notwithstanding these and numerous other warnings, CoreCivic continued to provide inadequate staffing, supervision and medical care at its facilities, including SCCC.

41. Under the leadership of its President and Chief Executive Officer Damon Hininger, CoreCivic has an established history of putting profits ahead of the health and safety of inmates. According to a 2011 lawsuit filed by the American Civil Liberties Union, for example, inmates referred to CoreCivic's Idaho Correctional Center as "Gladiator School" because the understaffing led to such a violent atmosphere at the prison. CoreCivic settled the lawsuit with the ACLU, agreeing to provide minimum staff levels, but the company was held in contempt of court in 2013 because it violated the agreement and falsified records to misrepresent the number of guards on duty. In 2014, the FBI opened an investigation of the company based on its billing for "ghost employees," Idaho Governor Butch Otter ordered state officials to take control of the prison, and the company paid the state $1 million for understaffing the prison.

42. On or about February 23, 2017, a federal jury found that CoreCivic had violated inmates' Eighth Amendments rights to be free from cruel and unusual punishment by being deliberately indifferent to the serious risk posed by the company's long-standing practice of understaffing the Idaho Correctional Center. The jury did not award damages, however, because it found that the inmates' particular injuries were caused by other factors.

43. At an Oklahoma prison operated by CoreCivic, ten prisoners were involved in a fight on February 25, 2015 that left five with stab wounds. The following month, eight more were involved in another stabbing incident. In June of that year, thirty-three gang members fought with weapons and eleven prisoners were sent to a hospital. On September 12, 2015, four inmates were killed during a riot at the same facility. Inmates alleged that gangs were effectively allowed to run the prison. According to an investigation by the Oklahoma Department of Corrections, video

evidence of the September 12, 2015 incident from three cameras at the facility was recorded over or deleted by CoreCivic employees. Two guards were later indicted for bringing drugs and other contraband into the prison, including one of the guards accused of failing to act during the riot. Between 2012 and 2016, one-third of all homicides in Oklahoma prisons occurred at two CoreCivic facilities, though they held just over 10 percent of the state's prison population.

44.  In August 2016, the Office of the Inspector General ("OIG") of the U.S. Department of Justice found widespread deficiencies in staffing and medical care at facilities operated for the federal Bureau of Prisons by private contractors, including those operated by CoreCivic. As a result, the Department of Justice indicated that it would phase out its relationships with private prisons. That, in turn, led to the shareholder lawsuit described above. In a separate report released on April 25, 2017, OIG found widespread understaffing at a detention facility in Leavenworth, Kansas operated by CoreCivic for the U.S. Marshals Service, with vacancy levels reaching as high as 23 percent between 2014 and 2015.  Earlier, the company tried to hide the fact that it was packing three inmates into two-inmate cells at Leavenworth, contrary to prison regulations. The following excerpt appears in the April 25, 2017 OIG report:

> In 2011, without the knowledge of the [U.S. Marshals Service], the [Leavenworth Detention Center or "LDC"] took steps to conceal its practice of triple bunking detainees. LDC staff uninstalled the third beds bolted to the floor of several cells designed for two detainees and removed the beds from the facility in advance of a 2011 American Correctional Association (ACA) accreditation audit. A subsequent CoreCivic internal investigation revealed that this may have also occurred during other ACA audits of the LDC.

The Plaintiffs restate the foregoing allegations as their own.

45.  In May of 2012, a riot at a federal prison operated by CoreCivic in Natchez, Mississippi resulted in the death of a guard and injuries to approximately 20 inmates and prison staff.  OIG investigated and alleged the following in a report released in December of 2016:

> The riot, according to a Federal Bureau of Investigation (FBI) affidavit, was a consequence of what inmates perceived to be inadequate medical care, substandard food, and disrespectful staff members. A BOP after-action report found deficiencies in staffing levels, staff experience, communication between staff and inmates, and CoreCivic's intelligence systems. The report specifically cited the lack of Spanish-speaking staff and staff inexperience.
>
> Four years after the riot, we were deeply concerned to find that the facility was plagued by the same significant deficiencies in correctional and health services and Spanish-speaking staffing. In 19 of the 38 months following the riot, we found CoreCivic staffed correctional services at an even lower level than at the time of the riot in terms of actual post coverage. Yet CoreCivic's monthly reports to the BOP, which were based on simple headcounts, showed that correctional staffing levels had improved in 36 of those 38 months.

The report specifically found that medical staffing was still inadequate four years after the riot. "DOJ OIG Releases Report on BOP Contract with CoreCivic to Operate the Adams County Correctional Center, Natchez, Mississippi," December 20, 2016, U.S. Department of Justice, Office of the Inspector General, https://oig.justice.gov/news/doj-oig-releases-report-bop-contract-corecivic-operate-adams-county-correctional-center, and "Audit of the Federal Bureau of Prisons' Contract with CoreCivic, Inc. to Operate the Adams County Correctional Center in Natchez, Mississippi," https://www.oversight.gov/sites/default/files/oig-reports/a1708.pdf. The Plaintiffs adopt the report's allegations as their own.

46. A state audit released in 2017 found that Whiteville Correctional Facility (operated by CoreCivic) needed 79 officers to cover 17 positions during a shift, but on average the facility provided only 57 officers per shift. The same audit found systemic problems at Hardeman County Correctional Center ("HCCC") and TTCC, including understaffing and gang violence. The audit further noted that information provided by CoreCivic concerning TTCC and HCCC was so incomplete that it was not possible to determine the accuracy of staffing levels. The Plaintiffs allege that CoreCivic deliberately provided incomplete information in order to disguise the fact that it was understaffing both facilities.

47. On December 12, 2017, a former guard at Trousdale-Turner testified before a legislative committee that she resigned from the company in September after witnessing two inmates die from medical neglect during the seven months that she worked for the company. Ashley Dixon told lawmakers that in one instance she pleaded with her superiors for three days to help a dying inmate, but to no avail, and her subsequent complaints were ignored by company officials.

48. The Plaintiffs allege that suicides in CoreCivic facilities are the result of deliberate indifference, particularly because of its policies of (1) inadequate mental health care; and (2) improper inmate classification. On August 30, 2016, for example, inmate Thomas Shane Miles was allowed to hang himself in an Indiana jail operated by CoreCivic despite two suicide attempts in the previous four days. On May 3, 2017, immigration detainee Jean Jimenez-Joseph was able to hang himself at a Georgia facility operated by CoreCivic, despite the fact that he was supposed to be on suicide watch. At the same facility less than two years later, another immigrant on suicide watch, Efrain De La Rosa, was nonetheless able to hang himself. In 2018, the family of Jose de Jesus Deniz-Sahagun filed suit against CoreCivic because he was allowed to kill himself at Eloy Detention Center, an immigrant detention facility operated by CoreCivic. According to a February 24, 2018 story in the *Pinal Central* newspaper,

> His was the fifth suicide reported at the Eloy facility since the mid-2000s, a high number compared to other detention centers across the country.
>
> The detainees who preceded Deniz-Sahagun hanged themselves with bed sheets or shoelaces.
>
> An analysis by National Public Radio in 2016 determined that the prison had the highest number of deaths in the country. The *Arizona Republic* made the same determination in 2015.

On December 6, 2018, Ross Hamilton Anderson was found hanging in his cell at Trousdale-

- 16 -

Turner.

49. Defendant CoreCivic's indifference toward inmates' medical needs was widely known inside and outside of the company based on widespread media reports of inadequate medical care at the company's facilities. *See, e.g.,* "Mexican man's widow sues over Otay Mesa jail death, says pleas for help ignored," March 23, 2017 *The San Diego Union-Tribune*, https://www.sandiegouniontribune.com/news/courts/sd-me-detention-lawsuit-20170323-story.html; "Lawsuit: CoreCivic Staff Ignored Scabies Infection For A Full Year," July 31, 2017 *NewsChannel5 Nashville*, https://www.newschannel5.com/news/lawsuit-corecivic-staff-ignored-scabies-infection-for-a-full-year; "Man's death hints at wretched medical care in private immigration prisons," November 1, 2016 *The Guardian*, https://www.theguardian.com/us-news/2016/nov/01/jose-jaramillo-private-immigration-prisons-medical-care;   A March 10, 2017 report specifically noted that immigrant detainees were placed in the isolation unit (not unlike SCCC's disciplinary segregation) rather than the medical unit, and one of those detainees, like Addison, had a mental health condition. *See* "ICE detainees are asking to be put in solitary confinement for their own safety," March 10, 2017 *The Verge*, https://www.theverge.com/2017/3/10/14873244/ice-immigrant-detention-solitary-trump-corecivic-geo. And as of 2018, CoreCivic was facing multiple lawsuits due to inadequate medical care at TTCC. *See* "At Tennessee's largest prison, diabetic inmates say they are denied insulin to 'maximize profits'," August 7, 2018 *The Tennessean*, https://www.tennessean.com/story/news/2018/08/07/corecivic-diabetic-inmates-denied-insulin-trousdale-turner/925297002/.

50. The Plaintiffs allege that the foregoing incidents actually understate the problem. A scathing audit released by the Tennessee Comptroller on January 10, 2020 found that CoreCivic

had not properly recorded information about accidents, illnesses, and traumatic injuries at two of its facilities in Tennessee. Likewise, nurses at two CoreCivic facilities failed to monitor inmates to insure they were taking their medications, increasing the likelihood that mentally-ill and suicidal inmates would skip their medications. The same audit found that Whiteville Correctional Facility, which is operated by CoreCivic, was missing nearly one-third of its medical and mental health personnel during two different audit periods, and that homicides were two times more likely in CoreCivic facilities than in state-operated facilities.

## Claims

### Count 1: Civil Rights Violations

51. All prior paragraphs are incorporated herein by reference.

52. The Plaintiffs bring claims against the following Defendants under 42 U.S.C. §1983 because they violated Addison Smith's Eighth Amendment right to be free from cruel and unusual punishment. The Defendants named herein were deliberately indifferent and failed to protect Addison from self-harm and suffering, whether directly or indirectly. Among other things:

(a) Defendants Whitehead, Ackerman, Williams, King, Ray, Ratliff, and Avila ignored Addison's threats of suicide on the day of his death and failed to provide him with any food on the day of his death.

(b) Defendant Steadman failed to ensure that Addison was receiving the medication that he required. Addison suffered greatly from prescription drug withdrawal, and that suffering (as well as the lack of any treatment) contributed to his suicide.

### Count 2: Wrongful death

53. All prior paragraphs are incorporated herein by reference.

54. The Plaintiffs assert their common-law claims against the Defendants under the

- 18 -

Tennessee wrongful death statute. *See* Tenn. Code Ann. § 20-5-106.

**<u>Count 3</u>: Medical malpractice**

55. All prior paragraphs are incorporated herein by reference.

56. The Plaintiffs bring claims against Defendants CoreCivic, Long, Sigler, Bloodgood-Grandy, Steadman, and Turner for medical malpractice. Defendant Turner had a statutory duty to supervise Defendant Steadman and he failed to do so. If he had read Addison's files as he was required to do, he would have known that Addison had not been provided medication for at least six weeks. John Doe and Defendants Sigler and Long failed to notify guard staff that Addison was at high risk of suicide, and they failed to ensure that Addison was housed in the proper unit. Even without a written policy or procedure, common sense and professional duty required them to take these steps.

**<u>Count 4</u>: Gross Negligence**

57. All prior paragraphs are incorporated herein by reference.

58. The Plaintiffs bring claims against all of the Defendants for gross negligence leading to the death of Addison Smith. Defendant CoreCivic is liable for the gross negligence of its employees and agents, and it is liable for gross negligence leading to the rape of Addison. Addison never should have been housed in the same cell as Marcayus Rose.

**<u>Count 5</u>: Negligence**

59. All prior paragraphs are incorporated herein by reference.

60. The Plaintiffs bring claims against all of the Defendants for negligence leading to the death of Addison Smith. Defendant CoreCivic is liable for the negligence of its employees and agents, and it is liable for negligence leading to the rape of Addison. Addison never should have been housed in the same cell as Marcayus Rose.

## Request for Relief

61. The Plaintiffs respectfully pray that upon a final hearing of this case, judgment be entered for them against the Defendants, for actual and punitive damages together with pre-judgment interest at the maximum rate allowed by law; post-judgment interest at the legal rate; costs of court; and attorney fees. The Plaintiffs further seek disgorgement of the profits that Defendant CoreCivic earned while mismanaging SCCC and other facilities; damages for their loss of filial consortium with Addison; and such other and further relief to which the Plaintiffs may be entitled at law or in equity.

**THE PLAINTIFFS DEMAND A JURY TRIAL.**

Respectfully submitted,

**/s/ Janet H. Goode**
Janet H. Goode
Tennessee BPR No. 035872
917 S. Cooper Street
Memphis, Tennessee 38104
(901) 308-7511
(901) 641-3972 (fax)
*janet@janetgoodelaw.com*

**/s/ Ty Clevenger**
Ty Clevenger (admitted *pro hac vice*)
Texas Bar No. 24034380
P.O. Box 20753
Brooklyn, New York 11202-0753
(979) 985-5289
(979) 530-9523 (fax)
*tyclevenger@yahoo.com*

**Attorneys for Plaintiffs**

- 20 -